Argued and submitted July 12, reversed and remanded for new trial September 15, 1999, petition for review denied January 25, 2000 (329 Or 607)

In the Matter of
Tiffany Marie Eldrige, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Dollie Jean ROGERS,
aka Dollie Jean Eldrige, Dollie Jean Linker,
and Dollie Jean Parks,
*Appellant.*

(98-JV-008; CA A105148 (Control))

In the Matter of
Christina Jo Eldrige, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Dollie Jean ROGERS,
aka Dollie Jean Eldrige, Dollie Jean Linker,
and Dollie Jean Parks,
*Appellant.*

(98-JV-009; CA A105149)
(Cases Consolidated)

986 P2d 726

J. R. Perkins III argued the cause and filed the brief for appellant.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Sheila Annette Dale argued the cause and filed the brief for minor child Tiffany Eldrige.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Mother appeals from a circuit court order terminating her parental rights to her two daughters, aged 12 and 14 at the time of the trial. Mother argues on appeal that her trial counsel was inadequate, and, as a result, the trial that resulted in the termination of her parental rights was fundamentally unfair. The state must prove the basis for termination of parental rights by clear and convincing evidence. ORS 419B.521. On *de novo* review, we agree that mother's counsel was not adequate and that, as a result, mother was not afforded a trial that was fundamentally fair. We therefore reverse and remand.

Tiffany Eldrige was born in September 1984. Christina Eldrige was born in July 1986. In 1988, the children's father, David Eldrige, divorced mother and was awarded sole custody of both children in the State of Washington. Father refused to permit visitation with the children and returned all communications and packages that mother sent to the children. Mother was indigent and could not afford a lawyer to enforce her visitation rights. She paid some child support but was many years in arrears at the time of the trial.

In 1991, mother's parental rights to another child were terminated in the State of Washington, after mother defaulted in that proceeding. That child was born with numerous health problems, including fetal alcohol syndrome. Mother testified in the present proceeding that she was homeless at the time the child was born and lacked the ability to take care of him.

In May 1996, the two children at issue in the present case came to the attention of the Morrow County State Office for Services to Children and Families (SOSCF) after father's girlfriend threatened to kill Tiffany. The children reported that they routinely had been beaten with razor straps and that father and his girlfriend smoked marijuana in front of them and stored it in a location that was accessible to them. SOSCF placed the children in care with their paternal grandmother and step-grandfather and established a goal to return the children to their father.

Shortly thereafter, Tiffany revealed that her step-grandfather had sexually abused her, and the children were moved to foster care. SOSCF continued to maintain a goal of reunifying the children with their father if he completed required drug treatment and therapy. An SOSCF caseworker contacted mother by letter in July 1996, and mother responded within a few days by telephone. Mother made it clear that she wished to be a party to any SOSCF proceedings and wished to have an attorney appointed.

An October 1996 Citizen Review Board (CRB) finding supporting SOSCF's plan noted that mother had not been in contact with the children or provided any support for them for many years and that she "is known by [SOSCF] in the Douglas County area and is not considered a resource for Christina and Tiffany."[1] In November 1996, SOSCF identified as an objective that it would seek termination of both father's and mother's parental rights.

In December 1996, an attorney was appointed for mother. A January 1997, SOSCF administrative review revealed that mother had contacted the CRB in late 1996, expressing her wishes to be considered a resource for the children. An SOSCF worker instructed mother that she needed to be reintegrated into the childrens' lives slowly and told her to mail cards or letters to SOSCF. This administrative review showed that SOSCF's plans were focused on reintegrating the children with their father. In February 1997, a SOSCF worker sent mother a brochure describing SOSCF services.

A March 1997 CRB finding indicated that father was making no progress toward being reunited with the children and recommended that SOSCF work toward adoption of the children if father did not immediately respond to offered services. This report also noted that mother had made several contacts seeking visitation but that she had not sent the children letters through SOSCF as instructed by the caseworker. The report did not mention the possibility of mother as a placement resource for the children.

---

[1] No evidence was presented in the present case concerning any previous interactions between mother and Douglas County SOSCF.

In May 1997, a review hearing was held, at which mother appeared and was represented by court-appointed counsel. Mother, who lived across the state in Douglas County, hitchhiked to the hearing. Mother requested travel money from SOSCF during this visit, but her request was refused, apparently on the ground that mother had not made the request for travel money earlier. The court continued the wardship of the children, ordered supervised visitation for mother, and ordered SOSCF to conduct a home study of mother's home. Mother had a visitation with her daughter Christina in May 1997, but her other daughter was unavailable during that visit.

Further CRB findings and administrative review materials indicate that, although mother mailed postcards for the children as required by the SOSCF caseworker, SOSCF was not actively trying to facilitate visitation between mother and the children, apparently because the children did not wish to meet their mother at that point.

Also in 1997, a Morrow County SOSCF worker, Smith, contacted Douglas County SOSCF requesting that a home study be carried out as ordered by the court. A Douglas County SOSCF worker, Newman, visited mother's home, where she lived with her mother and her mother's boyfriend. Newman reported that the home was modest but neat and comfortable and had adequate living space for the children. Newman further noted that mother canceled several follow-up appointments because she had to go to the dentist and that he tried twice to call her to reschedule but was unable to reach her. Although Newman saw no problems in the home itself, he indicated in his report (and later in testimony at trial) that other workers in his office told him that mother's brother had sexually abused a child. He indicated that, although he knew that the brother did not live at the residence, he believed that mother should move out of Douglas County and establish a relationship with her children elsewhere. Neither he nor Smith communicated that conclusion to mother. Smith was aware that mother was taking care of her own mother, who had suffered from a stroke, and that she lacked the financial resources to move across the state to be nearer the location where SOSCF had placed her children. In

a July 1997 telephone conference with Smith, Newman recommended a psychological evaluation of mother, but Smith testified at trial that she did not wish to obtain a psychological evaluation or offer services until she had more information about mother.

Later in 1997, mother made plans to travel across the state to visit the children, but the plans fell through due to her lack of transportation and funds. Smith left several messages for mother, asking mother to call her collect, but mother did not call. In December 1997, SOSCF notified mother of its intention to seek termination of her parental rights. When the decision was made to seek termination of parental rights, the case was transferred to another SOSCF worker whose only contact with mother was to leave a telephone message offering visitation and to mail termination plan updates to mother. Mother visited the children in October 1998.

The termination proceeding was held in December 1998. At the beginning of the proceeding, the attorney who had been appointed several months earlier to represent mother informed the court that he had never met or spoken with mother and apparently was taken by surprise when mother appeared for trial. He indicated that his office had sent mother a notice informing her that she needed to schedule an office appointment but she had not done so. He indicated that he had come to court only to seek permission to withdraw from the case and that he had not had time to prepare for a trial. He stated that he had received discovery of the 800-page SOSCF file only two days earlier as had the children's Court Appointed Special Advocate (CASA), had not had time to talk to his client, and had no idea whether she wanted to call any witnesses. He further indicated that, based on his brief conversation with mother before the trial, it appeared that mother had not understood that the proceeding was to be a trial and that she thought the proceeding was to appoint an attorney to represent her. The attorney moved to withdraw from the case. Mother also asked that the attorney be allowed to withdraw from the case. The attorney moved, in the alternative, for a continuance so he could prepare for trial. The trial court denied the motions but allowed a 10-minute break for the attorney to prepare to try the case.

At trial, the state put on the evidence described above concerning its efforts, such as they were, to work with mother. Evidence indicated that no adoptive placement had been arranged for the children, although they were the "second choice" of a couple that wished to adopt a different child.

Mother testified on her own behalf. She indicated that she had been unable to maintain regular visitation with the children due to lack of money and transportation. She testified that she had tried to hitchhike across the state on several occasions to see the children, but had not made it very far. She indicated that her driver's license had been suspended due to lack of insurance and that she had no job or funds. She testified that her brother, who had been convicted of sexual abuse, did not live at the residence she shared with her mother and that he did not visit the residence. Tiffany, the older of mother's two children, testified that she did not wish her mother's parental rights to be terminated.

The court terminated mother's parental rights to both children on numerous grounds of unfitness and neglect. The court specifically found that mother had failed "to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

On appeal, mother argues that the trial court abused its discretion in denying her motion for continuance on the day of trial given her attorney's unpreparedness and further argues that her attorney's performance was inadequate, and, as a consequence, the termination proceeding was not "fundamentally fair." The CASA appointed to represent mother's oldest daughter Tiffany also asserts on appeal that the court abused its discretion in refusing mother's request for a continuance and that the termination proceeding was unfair. We do not address mother's and daughter's first argument because we agree with the second argument, as explained below.

The termination of the rights of a parent is "one of the most drastic actions the state can take against its inhabitants." *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 186, 796 P2d 1193 (1990). It is also the type of proceeding where the

need for finality dictates that procedures used, including appeal, be carried out expeditiously. *Id.* at 186-87. Because of the importance of expeditious resolution of such proceedings, a parent may challenge the adequacy of court-appointed counsel in the course of a direct appeal from a termination on parental rights. *Id.*

■■     The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that the proceedings to terminate parental rights be "fundamentally fair." *Geist*, 310 Or at 189 (citing cases). The Supreme Court stated:

> "The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner. *See generally Mathews v. Eldrige*, 424 US 319, 333, 96 S Ct 893, 47 L Ed 2d 18 (1976). Fundamental fairness emphasizes factfinding procedures. The requirements of notice, adequate counsel, confrontation, cross-examination, and standards of proof flow from this emphasis. *McKeiver v. Pennsylvania*, 403 US [528,] 543, [91 S Ct 1976, 29 L Ed 2d 647 (1971)]. Fundamental fairness is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 189-90.

In terms of adequacy of counsel, fundamental fairness does not require any particular theory of the case, and tactical choices by counsel generally will not constitute inadequate assistance. *Id.* at 190.

■     A parent claiming inadequate assistance of counsel in a termination proceeding has the burden of establishing that the proceeding was fundamentally unfair and that counsel's "inadequacy prejudiced her cause to the extent that she was denied a fair trial and, therefore, that the justice of the circuit court's decision is called into serious question." *Id.* at 191. We believe that mother has met that burden here.

■     Mother's trial counsel candidly admitted that he did not prepare to conduct a trial. The state places the "blame" for counsel's lack of preparation squarely on mother, noting that she did not respond to counsel's notification that she should schedule an appointment at his office on the other side of the state. We do not agree that counsel's inadequacy was due solely to mother's conduct. When mother's counsel

informed the court that he had not received the SOSCF file until two days before the trial, the state indicated that discovery had been available on request earlier, but no request had been forthcoming. Mother's counsel indicated that he had sent a form letter requesting some discovery materials, and had received some, but that he was unaware of the existence of the 800-page file that he received two days before trial.

Had counsel sought and received the file in time to conduct even a minimal review of the material contained therein, he would have been able to discern that the vast majority of it concerned SOSCF's efforts to reunite the children with their father and that the file was almost entirely devoid of any evidence that SOSCF had offered services to mother to assist her in making adjustments that would allow the integration of the children into her home. In fact, the contents of the file make it clear that no such goal was ever envisioned by any of the SOSCF workers involved in the case. Although a partially completed home study ordered by the court was included in the file, there was no psychological evaluation of mother, no record of her ever being offered any parenting classes, no record of SOSCF attempting to assist her in overcoming the financial and transportation barriers that prevented her from traveling across the state to see the children; and no record that SOSCF considered placing the children in foster care in a location more conducive to mother establishing a relationship with them. In short, counsel's failure to review the record and to prepare for trial on the termination of mother's parental rights was inadequate to satisfy the "fundamental fairness" standard enunciated by the court in *Geist*.

■ The state argues that, even if mother's counsel was inadequate, mother has nonetheless failed to demonstrate that she is entitled to a reversal and remand. In *Geist*, the court noted that a finding of inadequacy does not end the appellate court's inquiry; the court must determine whether, even with adequate counsel, the result inevitably would have been the same. *Geist*, 310 Or at 191. The state contends that the result in the present case was inevitable, arguing that there is no indication that a psychological evaluation would have assisted mother's case, no indication that mother would be any more able to parent these children than she was able

to parent her other child who was the subject of the Washington State termination, and no indication that she would have taken advantage of any services had they been offered by SOSCF. We disagree.

The record indicates that mother was homeless and most probably suffered from a serious alcohol problem at the time of the Washington State termination in 1991. The record reveals that, shortly before the trial in the present case, mother was living in a clean and comfortable home that had adequate living space for her children.[2] Although mother had two convictions for possession of controlled substances in 1994 and 1995, the record does not affirmatively demonstrate that she currently suffers the type of severe alcohol or drug problems that appear to have interfered with her parenting abilities in the past. Although the record does demonstrate that mother has not been particularly good at following through with SOSCF workers and with her court-appointed attorney located on the other side of the state, the record also demonstrates that the workers' and her attorney's efforts to work with mother have been half-hearted, at best. On this record, we cannot say that, even with adequate counsel, it was inevitable that mother's parental rights would have been terminated.

Reversed and remanded for a new trial.

---

[2] The state appears to have abandoned the argument that the sexual abuse conviction of a relative who does not live in or visit mother's home precludes the placement of children in the home.