12 P.3d 537 (2000)
170 Or. App. 383
In the Matter of Cory Brian Stephens, a Minor Child.
STATE ex rel. STATE OFFICE FOR SERVICES TO CHILDREN AND FAMILIES, Respondent,
v.
Shannon M. Stephens THOMAS and Ryan W. Thomas, Appellants.
(3779J; CA A107234)
Court of Appeals of Oregon.
Argued and Submitted May 24, 2000.
Decided October 11, 2000.
*538 Wes Williams argued the cause and filed the brief for appellant Shannon M. Stephens.
Sheila Annette Dale, Hood River, argued the cause and filed the brief for appellant Ryan W. Thomas.
Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.
Before LANDAU, Presiding Judge, and DEITS, Chief Judge, and WOLLHEIM, Judge.
WOLLHEIM, J.
Mother and father appeal the trial court's judgment terminating their parental rights for unfitness, ORS 419B.504, and neglect, ORS 419B.506. We reverse and remand the judgments terminating both parents' parental rights. On review for an abuse of discretion, State ex rel. Juv. Dept. v. Mohamed, 53 Or.App. 407, 411, 632 P.2d 31 (1981), we hold that the trial court did not abuse its discretion in denying father's request for a continuance. On de novo review, State ex rel. Juv. Dept. v. Geist, 310 Or. 176, 185, 796 P.2d 1193 (1990), we hold that father's trial counsel was inadequate. We reverse and remand for a *539 new hearing as to father. As to mother, we vacate and remand the judgment terminating mother's parental rights for reconsideration only of child's best interest and only if the trial court does not terminate father's parental rights. If father's parental rights are terminated, then the court shall reinstate the judgment terminating mother's parental rights.
The evidence from the termination hearing established the following relevant facts. Child was born in December 1995. Mother and father were not married nor communicating at the time of child's birth, and for some period of time father did not know about child. When child was 13 months old, father and mother reconciled and lived together. Father sought to be and was determined to be the father of child. The relationship between mother and father was rocky and marked by substance abuse, domestic violence, and criminal activity. When child was 19 months old, mother left father in Portland and moved to LaGrande with child, apparently without telling father where she could be reached. About a month later, in September 1997, mother was arrested for hindering prosecution and criminal conspiracy.
Child was taken into the protective custody of the State Office for Services to Children and Families (SCF) and placed in foster care in LaGrande. Trepoy, the family's first SCF caseworker, contacted father in Portland the day after placing child in foster care, and father said that he wished to be considered a resource for child's placement and that he planned to come to LaGrande, visit child, and get an attorney. In mid-October 1997, father moved to LaGrande and planned a visit with child; however, father was arrested for a domestic dispute incident with mother before attending the visit. Father was sentenced for a probation violation in Clackamas County.
The original goal was to return custody of child to mother, who was viewed as the primary care giver, within 30 days. In early October 1997, mother signed a service agreement with SCF, and, from October to November, SCF offered mother intensive home services. Those services apparently did not go well.
Between November 1997 and late May 1998, mother and father moved between the LaGrande area and the Portland area and spent various amounts of time in jail. At one point, in November, mother reportedly told SCF that both mother and father wished to give child up for adoption. In early December, however, mother called SCF and indicated that she and father did not want to give child up for adoption. However, the record indicates that the family's second SCF worker, Burnell, never spoke directly with father about his wishes.
On December 19, 1997, Burnell sent father his first letter of expectation from SCF to an address where father reportedly was living. SCF's expectations included, among others, that father undergo residential and out-patient alcohol and drug treatment, undergo parent training, and complete batterer's education. Father never responded to that letter. However, the record does not indicate whether father received that letter or resided at the address where Burnell sent it.
In late January 1998, mother and father met with Bristow, the family's third SCF worker, and both indicated that they did not wish to give child up for adoption but wished to be reunited with child. At that meeting, Bristow hand delivered the letter of expectation to father and went over its contents. In early February, mother and father visited child. There is some testimony in the record that mother and father sought drug and alcohol treatment during this time (December to February) but had difficulty obtaining such treatment.
The record is sparse regarding the time period between February and late May 1998. However, SCF and mother had some contact, including a request in early April from mother to arrange a visit between child, mother, and father. On March 31, 1998, Avery, the family's fourth SCF worker, mailed father his second letter of expectation from SCF, again to father's last known address in Portland. In addition to the expectations contained in the first letter, that letter asked father to set up and begin regular contact with child and with SCF. In late May to *540 early June 1998, mother and father moved back to LaGrande and began setting up a plan to facilitate visitation and reunification. At one of these meetings, Avery went over the letter of expectation with father, and, in June 1998, father and mother began regular visits.
On June 16, 1998, SCF filed petitions to terminate the parental rights of mother and father on the grounds of unfitness, ORS 419B.504, and neglect, ORS 419B.506.[1] SCF was not offering mother and father services at that time. Nonetheless, mother and father began drug and alcohol treatment programs. Due to the high cost of the domestic violence education program, father could not afford to undergo that program, but he did complete an anger management program. In August 1998, father was again arrested on a probation violation, transported to Lane County, and sentenced to 60 days in jail. In October 1998, father was released, and he moved back to LaGrande and again resumed visits with child. In November, mother and father were married. Child attended the wedding. Between October 1998 and January 1999, mother and father continued regular visitation with child and had obtained stable housing, but they still needed to obtain a stable income source and work on domestic violence issues. Testimony indicated that father was gentle and loving with child but lacked some parenting skills. In December, mother gave birth to mother and father's second child, a daughter. Father suffered a relapse into substance abuse in December and voluntarily offered that information to SCF and agreed to continue working on his substance abuse problems.
In January 1999, SCF postponed action on the termination petition. On January 15, 1999, SCF entered into its second service agreement with mother and its first agreement with father. For the first time, SCF began offering services to father. The service agreement required father to visit regularly with child, participate in parent training, participate in anger management classes, participate in a drug and alcohol plan, including attending Alcoholics Anonymous and providing a log of that attendance, remain drug and alcohol free, maintain stable housing and income, avoid engaging in criminal activity, and undergo domestic violence education. SCF offered intensive parent services that were terminated in February 1999, after mother and father had a domestic dispute where alcohol was a factor. SCF decided to proceed with the termination petition.
At the time of the termination hearing in June 1999, mother was enrolled with their daughter in a residential treatment facility for women, and father was enrolled in a residential treatment facility as a condition of *541 his probation. Father, reportedly, wanted to attend the hearing and was very committed to and focused on the treatment program. Father had also enrolled in a more affordable domestic violence program that had recently become available in Union County.
The trial court ordered termination of father's and mother's parental rights, terminating father's rights on grounds almost identical to those cited in the petition. In its findings of fact, the trial court, by reference to the SCF files and exhibits, adopted the time line of facts described above. The court also observed the long history of both mother and father with drugs, alcohol, and criminal activity and noted that father had not achieved the goals of maintaining sobriety, abstaining from criminal activity and domestic violence, or maintaining a stable home and income. The court considered the services offered to mother and father and noted the periods of time that mother and father did and did not visit child. Although the court noted father's limited involvement with child, it did not doubt that father loved child. Importantly, the court also accepted the findings and conclusions of Dr. Starr, who conducted a psychological evaluation of father, and Dr. Eastman, who conducted a psychological evaluation of child.
Starr's evaluation of father occurred in November 1998, about a year and a half before the termination hearing. Starr diagnosed father with alcohol, amphetamine, and cannabis abuse in early full remission and with antisocial personality disorder. Starr was not primarily concerned with father's substance abuse but noted that
"[father] is an impatient young man and when push comes to shove he is likely to make his decisions based on his immediate need. He has a history of antisocial behavior including having spent some time in prison. He has good intentions, but frankly, his history of following through behaviorally does not predict well for the future."
Starr recommended that father be required to remain drug free and employed and that father undergo substance abuse treatment and undergo education about the seriousness of his assaultive behavior with women and how that behavior affects his children. Starr explained that father could benefit from treatment and that "[w]ith treatment [he] has a chance to become a responsible father to his children. Without treatment it is likely that he will continue to engage in illegal behavior with relapses to substance abuse."
From Starr's brief observation of father with child, Starr stated that father's interaction with child suggested an interest in child. Starr explained that father was solicitous of child's attention and that child was comfortable in the company of father, but that child did not initiate close physical contact with parents. Starr noted that father lacked some essential parenting skills, such as being able to direct child.
Eastman evaluated child in April 1999. Eastman explained that child had been in the same foster placement for 19 months, approximately half of child's life and during a critical bonding time for child. She concluded that child had not waited for mother and father to stabilize but had moved forward and developed strong psychological bonds with his foster family and was well-adjusted and thriving there. Eastman recommended that mother and father's parental rights be terminated because "their diagnostic issues, history of frequent relapse, and lack of long-term stability in treatment programs, [create an extremely high] * * * risk of recurring violence and substance abuse problems." Eastman also noted that, while an open adoption arrangement was not recommended, child had displayed playful and comfortable visitations with his sister and parents. Eastman's observation was that child was happy to see mother and father and his baby sister, that mother and father were nurturing and playful with child, and that mother and father expressed their love for him.
On appeal, father contends that his trial counsel was inadequate primarily because his attorney failed to procure father's attendance at the termination hearing and was unprepared to proceed at the hearing. As stated above, father was in a residential treatment facility as a condition of probation. The record indicates that leaving the treatment facility on his own accord would have *542 likely resulted in a violation of his probation but that father's attorney could have procured father's attendance at the hearing by subpoena. The evidence indicates that father wished to attend the hearing but that his attorney neither asked personnel at the treatment facility about allowing father to attend the hearing nor, we assume, served a subpoena at the treatment facility for father's attendance.
At the termination hearing, father's attorney requested a continuance because he was not prepared to proceed, in part, "given my client is not here."The trial court denied the request for a continuance. On appeal, father contends that the denial was an abuse of the court's discretion. In denying the request, the court explained that the date for the two-day hearing had been set for two and a half months and that
"the law now favors children. The law is quite clear that we do not wait and wait and wait and wait and wait for parents * * * [but] proceed because the child cannot wait, and the fact that [father] for whatever reasons is in a treatment program and for whatever reasons is not here today, I am explicitly finding that it is not grounds to continue this hearing and we will go forward."
The trial court offered "to do whatever is necessary to get [father] here tomorrow," offered to take telephonic testimony, and offered to hold the record open, if necessary, to give father the opportunity to make a statement in person. There is no indication in the record that father's attorney pursued any of the above offers.
We reject without discussion father's argument that the trial court abused its discretion in denying father's request for a continuance of trial. Considering the length of time for which the hearing was set, the focus of the proceeding on the child's needs, see State ex rel. SOSCF v. Stillman, 167 Or.App. 446, 456, 1 P.3d 500 (2000) (in determining whether integration can happen within a reasonable time, the focus is on the child's emotional and developmental needs and ability to form lasting attachments), and the court's offers of accommodation, we conclude that the trial court did not abuse its discretion in denying the motion for continuance. Mohamed, 53 Or.App. at 411, 632 P.2d 31.
We next address father's argument that his trial counsel was inadequate. In Geist, 310 Or. at 185, 796 P.2d 1193, the Supreme Court held that the statutory right to counsel in termination cases includes "a right to adequate counsel." "Because of the importance of expeditious resolution of such proceedings, a parent may challenge the adequacy of court-appointed counsel in the course of a direct appeal from a termination of parental rights." State ex rel. SOSCF v. Rogers, 162 Or.App. 437, 445, 986 P.2d 726 (1999), rev. den. 329 Or. 607, 994 P.2d 132 (2000) (citing Geist, 310 Or. at 186-87, 796 P.2d 1193). Due process requires that the proceedings to terminate parental rights be "fundamentally fair":
"The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner. Fundamental fairness emphasizes factfinding procedures. The requirements of notice, adequate counsel, confrontation, cross-examination, and standards of proof flow from this emphasis. Fundamental fairness is flexible and calls for such procedural protections as the particular situation demands." Geist, 310 Or. at 189-90, 796 P.2d 1193 (citations omitted).
Accord State ex rel. Juv. Dept. v. Charles, 123 Or.App. 229, 233, 859 P.2d 1162 (1993), rev. den. 318 Or. 326, 867 P.2d 1387 (1994). We have held that a parent claiming inadequate assistance of counsel in a termination proceeding must establish (1) that the proceeding was fundamentally unfair and (2) prejudice to the extent that the parent was denied a fair trial. Rogers, 162 Or.App. at 445, 986 P.2d 726.
In determining the adequacy of counsel, the Geist court found it relevant to examine whether the mother's counsel in that case
"advocated vigorously for her, sought and obtained discovery, used an investigator, interviewed witnesses, briefed the pertinent legal issues, spent appropriate time and energy preparing for trial, effectively cross-examined the state's witnesses, and called witnesses in support of her theory of *543 the case * * *." Geist, 310 Or. at 193, 796 P.2d 1193.
The court found that the mother's counsel accomplished all of those things and ultimately concluded that the court proceeding was fundamentally fair. Recently, in Rogers, we reached the opposite conclusion, finding the mother's trial counsel in that case inadequate. There, we explained that, in examining the adequacy of counsel, "fundamental fairness does not require any particular theory of the case, and tactical choices by counsel generally will not constitute inadequate assistance [of counsel]." 162 Or.App. at 445, 986 P.2d 726. After reviewing many of the factors considered by the Geist court, in Rogers, we concluded that the failure of the mother's trial counsel to obtain the SCF file and records, to review the record, and to prepare for trial constituted inadequate assistance of counsel. Id. at 446, 986 P.2d 726.
Here, father's counsel failed to advocate any real theory of the case, and we do not attribute most of counsel's omissions at trial to tactical decisions. To begin with, counsel's opening consisted of the following:
"Your Honor, again, [father] isn't here so I have difficulty with an opening statement in representing him. I think that [father] can be a good father. He's in treatment right now."
Counsel gave no closing argument. Sixteen witnesses testified. Those witnesses included the family's four SCF caseworkers; several other service providers associated with SCF; father's father, grandfather, and parole officer; mother's mother and residential treatment counselor; Starr, who had conducted a psychological evaluation of father; Eastman, who had conducted a psychological evaluation of child; and mother. Counsel did not call any witnesses for father, did not offer any written or oral testimony from father, nor did counsel cross-examine mother, any of the four SCF caseworkers or father's parole officer.[2] Review of the cross-examination of the other witnesses also provides little insight into any theory of father's case.
In addition, Starr's and Eastman's reports were made available only during the first day of trial, not beforehand.[3] It is unclear whether the reports were made unavailable until the day of the hearing by the prosecutor, in violation of ORS 419B.300(1)(c), or whether counsel failed to make a discovery request that would fairly have included the evaluations. Although counsel cross-examined the expert witnesses, counsel did not object to the introduction of the reports or the witnesses' opinions into evidence, did not request a continuance to prepare rebuttal evidence in consultation with father, nor obtain witnesses or testimony, including father's testimony, to rebut that evidence.
We find it difficult to attribute any of those omissions to "tactical decisions" because of counsel's failure to obtain father's presence or testimony. Because the record reveals that father wanted to attend, we cannot infer that father's absence or silence signals a lack of interest in child or was purposeful. Cf. State ex rel. Juv. Dept. v. Bryant, 84 Or.App. 571, 574, 735 P.2d 5 (1987) (in affirming termination of mother's parental rights where she failed to appear, court noted that the federal constitution requires that the state provide an opportunity for a hearing, but a citizen has a duty to cooperate in good faith with the judicial system). In addition, counsel admitted that he was unprepared for trial, in part, because of father's absence. We therefore infer that counsel's preparation from the record was minimal and that he needed to confer with father to prepare cross-examination and rebuttal testimony. Accordingly, father's absence, both in person and in substance, made it exceedingly difficult for his counsel to be able to cross-examine witnesses, to put on rebuttal evidence, to put on witnesses favorable to father, or to vigorously advocate any theory of *544 the case. That difficulty is substantiated by the record. Counsel's performance was inadequate.
However, a finding of inadequacy, standing alone, does not "require a remand or reversal if, on de novo review of the record, the reviewing court is satisfied that the proceeding was fundamentally fair and that even with adequate counsel, the result inevitably, would have been the same." Geist, 310 Or. at 191, 796 P.2d 1193. The trial court ruled that father was inadequate on two grounds, unfitness and neglect. The record indicates that father suffered from alcohol, drug, and domestic violence problems, that father was often in jail, and that father's contact with child and the agency was sporadic until May 1998. However, the record also contains credible evidence that, at the time of the hearing, father was undergoing residential drug and alcohol treatment, that father was working on his domestic violence issues, and that father and child displayed a gentle and loving relationship.
We do not know if father could present evidence that he was progressing well in treatment. But we will not assume that his prognosis was poor or that his recovery would be untimely where the record contains no current evidence about father's progress other than that he was very committed to the treatment program and that the expert psychologist concluded that father's substance abuse, violence, and anti-social behavioral problems could benefit from treatment. We also find it difficult to draw any conclusions about the cause or willfulness of father's irregular communication with SCF and child where counsel did not cross-examine mother or the SCF workers about the communications between the various parties.
Essential to our conclusion is the fact that the trial court was not given the opportunity to judge the credibility of father's case or his evidence, whatever father's case and evidence may in fact be. And on appeal, we, similarly, cannot pass on the credibility of father's case and draw negative conclusions where father was not given the opportunity to be heard. Cf. State ex rel. Juv. Dept. v. Boren, 105 Or.App. 599, 609, 806 P.2d 149 (1991) (affirming termination of father's parental rights on the basis of unfitness and neglect after concluding that father's testimony was not credible in comparison with other evidence and testimony in the record). In a situation, as here, where father wanted to put on a case, where there is some credible evidence that father could be a resource for child, and where counsel has not effectively advocated any theory of father's case, father has not been heard. Accordingly, we will not conclude that the result would have inevitably been the same. To conclude otherwise would eviscerate the "fundamental fairness" standard enunciated by the court in Geist. Accordingly, we conclude that this matter must be reversed and remanded for rehearing on the petition to terminate father's parental rights.
We turn to our disposition of mother's appeal. We apply a two-step analysis in deciding whether parental rights should be terminated in light of all of the circumstances. We first determine whether the state has proved by clear and convincing evidence any of the statutory grounds for termination, and, if so, we next consider whether clear and convincing evidence shows that termination of the parent's rights is in the child's best interests. State ex rel. Juv. Dept. v. Beasley, 314 Or. 444, 451-52, 840 P.2d 78 (1992). The best-interests determination can prevent termination, even if the statutory grounds for termination are established. Id. at 452 n. 14, 840 P.2d 78. After considering additional briefing on the matter, we conclude that we should reverse and remand the judgment terminating father's parental rights for a new hearing. As a consequence, we should vacate the judgment terminating mother's parental rights for reconsideration of child's best interest only if the trial court does not terminate father's parental rights. If father's parental rights are terminated, then court should reinstate the judgment terminating mother's parental rights.
ORS 419B.500 provides that "[t]he rights of one parent may be terminated without affecting the rights of the other parent." The state takes the position that we should affirm the judgment terminating mother's rights even if we remand father's petition for *545 rehearing on the basis of a "procedural defect." It reasons that because the "primary goal of termination of parental rights is to provide the child with an opportunity to live in a permanent, nurturing home"[4] and because its permanent plan here is to provide child with that home through adoption, there is no reason not to consider that termination of mother's parental rights is in child's best interests.
We agree that the state has proved mother's unfitness: mother had neither overcome nor completed treatment for alcohol, drug, and domestic violence problems and had exposed child to those elements, as well as to unstable housing and criminal behavior. The trial court also noted that some of mother's parenting problems, most particularly the domestic violence issues and to a lesser degree the alcohol issues, are connected to her relationship with father.
However, the state pursued mother's and father's petitions concurrently, and in assessing child's best interests, the trial court considered the parents' history of separation and then reconciliation. It concluded that the risk of mother relapsing was too high and that it was therefore not in child's best interests to place child in mother's home, because child would be devastated by an unsuccessful return to mother. The trial court concluded that time had simply run out for mother with respect to child. In contrast, child was strongly bonded with his prospective adoptive parents, where he had been living for approximately half of his life. Accordingly, assessing the best interests of child with respect to mother depended in part on father's fitness as a parent and the state's permanent plan of adoption. Based on those considerations, we agree that, if the trial court on remand determines that father is indeed unfit, the best interests of child would be served by terminating both mother's and father's parental rights in light of the state's permanent plan for child of adoption.
In contending that there is no reason not to consider that termination of mother's parental rights is in child's best interests because the state's permanent plan for child is adoption, the state contrasts its position in this case with the position it took on reconsideration in State ex rel. Juv. Dept. v. Proctor, 167 Or.App. 18, 2 P.3d 405 (Proctor I ), on recons. 169 Or.App. 606, 10 P.3d 332 (Proctor II) (2000). The state explains that, because in Proctor we reversed termination of mother's parental rights, its permanent plan for the child was no longer adoptive placement, but reintegration into mother's home. Accordingly, the state reasoned that it was not in the child's best interest to affirm termination of the father's rights and thereby cut off financial support from the father. In affirming termination of the father's parental rights on reconsideration, we noted that the child was seriously injured while in the parents' care and that the father was abusive and controlling towards the mother and the child. Proctor II, 169 Or.App. at 609-11, 10 P.3d 332. We therefore concluded that "the risks to child from father's continued involvement outweigh any possible financial benefits that child might receive from father." Id. at 611-12, 10 P.3d 332.
The distinction made by the state in Proctor II only begs the question here: what would be in child's bests interests if, on remand, the trial court determines that father is fit and does not terminate his parental rights? We can only assume that adoption could no longer be the state's permanent plan for child, see id. at 610-11, 10 P.3d 332, and the circumstances under which a court would assess the best interests of child with respect to mother will have drastically changed. A change in the state's permanent plan for a child does not necessarily affect the conclusion about a child's best interest with respect to the other parent's termination petition, see, e.g., id., but we believe that it might in this case.
The record indicates that there is a high likelihood that mother would maintain a presence in child's life if father's rights were not terminated. Mother and father were married at the time of trial, and, although mother *546 claimed that she was separating from father, she and father had demonstrated a pattern of separation and then reconciliation. In addition, mother and father share a daughter, child's younger sister, and, at the time of the termination hearing, SCF was working with parents to maintain daughter's placement with parents. Based on those facts, this may be an instance where, "when the plan is to seek to make one parent's home the child's permanent home, it would serve no purpose to terminate the other parent's rights, even if that parent has been proven unfit by reason of conduct or condition not likely to change in a reasonable time." Id. at 611, 10 P.3d 332 (citing State ex rel. SCF v. Reynolds, 149 Or.App. 36, 941 P.2d 1059, rev. den. 326 Or. 233, 952 P.2d 60 (1997)).
In assessing the best interests of a child on appeal, we have considered the grounds on which we have found the parent unfit and then weighed the benefits against risks involved in not terminating that parent's rights. This case is unlike either Proctor or Reynolds. We cannot say that the risks here would necessarily outweigh the benefits, see Proctor II, 169 Or.App. at 611, 10 P.3d 332, or that the benefits would necessarily outweigh the risks, see Reynolds, 149 Or.App. at 41, 941 P.2d 1059. As explained above, that is because both the benefits and the risks of not terminating mother's parental rights depend greatly on the findings of parental fitness with respect to father. Indeed the potential benefits could be great: while enjoying a stable and nonviolent home with his father, in not terminating mother's rights, child would likely be permitted greater contact with his sister and would certainly benefit from continuing SCF involvement and services to mother with respect to her parenting abilities for child.
We agree that the potential detriment to child could also be great. However, on this record, we have little basis to assess the likelihood or gravity of detriment to child without understanding father's parenting abilities and relationship with mother. In any event, we perceive little harm to child by permitting a trial court, one that would be better informed than we are at this point, to assess child's best interests. In addition, the state cannot proceed with its plan for adoption unless and until father's rights are terminated, so our decision adds minimal uncertainty and delay to child's permanent placement.
Judgment terminating father's parental rights reversed and remanded for new hearing; judgment terminating mother's parental rights vacated and remanded for reconsideration limited to question of child's best interest if trial court does not terminate father's parental rights; if father's parental rights are terminated, then judgment terminating mother's parental rights shall be reinstated.
NOTES
[1] The petition to terminate father's rights alleged, in part:

"[F]ather is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including but not limited to the following:
"(a) Criminal conduct that impairs the [father's] ability to provide adequate care for the child.
"(b) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"(c) Lack of effort or failure to obtain and maintain a suitable or stable living situation of the child so that return of the child to the father is possible.
"(d) Failure to present a viable plan for the return of the child to the father's care and custody.
"(e) Lack of effort to adjust the father's circumstances, conduct or conditions to make return of the child to the father possible.
"(f) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.
"(g) Abandonment of the child.
"* * * * *
"[Father] has failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition, as shown by, but not limited to, the following:
"* * * * *
"(b) Failure to maintain regular visitation or other contact with the child.
"(c) Failure to contact or communicate with the custodian of the child.
"(d) Failure to implement a plan designed to lead to the integration of the child into the father's home."
The petition to terminate mother's parental rights alleged similar grounds.
[2] Indeed, it appears that counsel did not realize that it was father's parole officer who was called to the witness stand by SCF.
[3] The record indicates that the SCF file was given to the attorneys at trial, but that the SCF filethe court reports, narratives, service agreements, and chronologieswas open to inspection. However, the attorneys indicated that they did not have access, before trial, to some of the other records pertaining to parents, including the psychological reports.
[4] As authority for that proposition, the state cites Geist, 310 Or. at 186-87, 796 P.2d 1193; ORS 419B.500; and ORS 419B.090(4).