Argued and submitted January 16, affirmed April 1, petition for review denied
June 4, 2009 (346 Or 257)

In the Matter of A. M.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

K. C.,
aka K. M. C.,
*Appellant.*

Linn County Circuit Court
J070331; Petition Number 07142JTM;
A139211

205 P3d 28

Daphne E. Mantis argued the cause and filed the brief for appellant.

Samuel A. Kubernick, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Mother appeals from a judgment terminating her parental rights to her son, A. The trial court found that, when A was six months old, mother shook him and caused serious injury. Based on that incident, a psychological evaluation, and other circumstances, the court held that mother was unfit by reason of extreme conduct, ORS 419B.502, and by reason of conduct or conditions seriously detrimental to A, ORS 419B.504, and that terminating mother's parental rights was in A's best interest, ORS 419B.500. On *de novo* review, ORS 419A.200(6)(b), we agree with the trial court's conclusion regarding extreme conduct; we therefore do not consider unfitness by reason of conduct or conditions. We also conclude that the trial court did not abuse its discretion in denying mother's pretrial motion for a continuance and her subsequent motion to keep the record open for additional evidence. Accordingly, we affirm.

A was born on October 27, 2006. At the time, mother was 19 years old and living in Albany with her mother, Robison; her three-year-old sister, for whom she frequently provided childcare; and her boyfriend, McCready.[1] When A was one month old, mother discovered a bruise on his chest and took him to the pediatrician. The next day, prompted by an anonymous report to Albany police that A had been abused, a Department of Human Services (DHS) investigator met with mother, and Dr. Chervenak examined A at a child abuse victim assessment center. Chervenak concluded that A's bruise was "consistent with abuse." She told mother her findings, including the fact that A's bruise "couldn't have been done accidentally." (She later testified that the bruising was consistent with someone "grabb[ing] the skin and squeez[ing] as hard as they could.") DHS ultimately concluded, consistently with McCready's admission that he had "picked [A] up the wrong way," that McCready was responsible for the injury. At trial, mother testified that A's injury was "solely an accident."

---

[1] Although A's birth certificate listed McCready as A's father, subsequent DNA testing revealed that McCready was not A's biological father. A has no legal father, and only mother's parental rights are at issue in this appeal.

Mother, McCready, and DHS agreed on a safety plan, effective through June 18, 2007, prohibiting McCready from having contact with A. Because mother agreed to honor the safety plan, DHS did not file a jurisdictional petition at that time, and A remained in mother's care. Mother and McCready subsequently ended their relationship, and DHS closed its case regarding McCready in early March 2007 after he had relocated to a different county.

In March 2007, mother and A (then five months old) moved to Vancouver, Washington, into the apartment of mother's new boyfriend, Guzman, where Guzman lived with his two cousins, Jamie and Roland, and Jamie's two young children. Roland testified that, although mother was "good at taking care of [A] from time to time," she would consume alcohol to the point of intoxication "[a]bout every other night" and, when "drinking and * * * really not in the mood for [A]," would leave A "with [Jamie] and take off with [Guzman]." Both Jamie and Roland testified that mother often became so "frustrated" with A that she would need to leave the room. While mother was living with Guzman, mother's father and stepmother, the Criders, cared for A most weekends.

On Monday morning, April 23, 2007, mother went to the park with Jamie, Roland, and the children. Mother and A returned to the apartment around noon. Jamie, Roland, and Jamie's children returned to the apartment one hour later, A was napping. Later that afternoon, Jamie observed A in an infant exerciser "slumped over," "just hanging there," and "just not doing anything really"; because A was "usually pretty active," this behavior concerned her.

That evening, mother left A in Guzman's care and drove into town with a friend, Tefotiller. While mother and Tefotiller were stopped at a traffic light, Guzman's mother, Ramona, with whom mother did not get along, opened mother's passenger-side door and assaulted her. Concerned that Ramona might attempt to harm A, mother telephoned Guzman and instructed him to leave A at Tefotiller's residence, where a babysitter, Troupe, was caring for Tefotiller's children.

The Criders agreed to pick up A at Tefotiller's apartment and met mother there. They observed that A was unusually quiet; Mrs. Crider noted that he was "almost lethargic," "wasn't moving very much," and was like a "rag doll." Mother explained that he had recently received immunizations and that his unusual behavior was a side effect. The Criders returned to their residence in Oregon City with A; mother stayed at the apartment.

A slept "a little bit longer than normal" on Tuesday morning. The Criders left him with a state certified childcare provider that day from approximately 8:00 a.m. to 4:00 p.m. The provider "express[ed] concerns about how [A] was acting." A slept through the night and had to be awakened on Wednesday morning, which was also unusual behavior for him.

On Wednesday, April 25, the Criders again left A with the care provider. That afternoon, the provider called 9-1-1 and reported that A was "limp and unresponsive." He was taken by ambulance to Legacy Emanuel Hospital in Portland, where it was determined that he had suffered an acute subdural hematoma caused by trauma. Dr. Lindsay, the director of the hospital's pediatric intensive care unit, later testified that "acute means * * * recent—the choices are acute or chronic—and [A's injury] was an acute one." However, he was unable to specify the precise date when A's injury had occurred; he testified that, although some "people are pretty good at aging [such injuries], * * * [he is] not one of th[ose] people." A was admitted to the hospital's pediatric intensive care unit. Mother put McCready on A's hospital visitation list.

That evening, Oregon City Police Detective Young interviewed mother at the hospital to investigate possible child abuse. Young testified that mother "told [him] right off the bat" that Troupe was responsible for A's injury. Mother also told Young that A had appeared "slightly floppy" on Monday night, but that she had assumed that he was tired.

On Thursday morning, April 26, mother met with a social worker, Johns, of CARES Northwest. Johns found that it was difficult to get information from mother because she was "so tangential." Also that morning, Dr. Skinner, a

CARES pediatrician, examined A; she also found it difficult "to get a clear history" from mother.

Skinner determined that A had suffered multiple-layer retinal hemorrhages and a subdural hematoma, which she described as "serious" and "life threatening" injuries consistent with "significant trauma" and "shaking." She also determined that A's multiple-layer, as opposed to single-layer, retinal hemorrhages indicated "more significant trauma."

A was released from the hospital into mother's care on Friday afternoon, April 27. That evening, mother voluntarily met with Vancouver City Police Detective Holladay of the Arthur D. Curtis Children's Justice Center, a child advocacy unit, and Detective Young, who had interviewed mother at the hospital. Mother initially denied any involvement in A's injuries and blamed Troupe. When confronted with inconsistencies in her statements, however, she stated that she had "not [been] truthful with the doctors at the hospital and that some other things * * * had happened to [A]." Mother then offered three explanations for A's injuries. First, she stated that, on Monday afternoon, A had "flung himself backwards in her arm and bumped the back of his head against an open door." Mother next stated that, while she was consoling A after he had bumped his head on the door, A had "bumped his head into the wooden arm on the side of the couch." Finally, mother stated that, after A had bumped his head on the couch, a small but "heavy bottomed" glass had "slipped out of her hands * * * from a distance of about 12 inches * * * [and] bumped [A] on the head."

Having been informed by Holladay that it was "highly unlikely" that any of those events could have caused A's injury, mother began to sob and said that, after those events had occurred, she had placed A into the baby exerciser and, ten minutes later, because he would not stop crying, had "picked [A] up roughly out of the exerciser and shook him hard a couple of times." Mother demonstrated how she had done so by holding her purse out in front of her and shaking it "back and forth." She stated that A stopped crying "immediately" afterwards and that he fell asleep for most of the afternoon. Mother stated that she felt "horrible" about shaking A

and "really shitty" about blaming Troupe. She insisted that she had "snapped momentarily," that her actions were not intentional, and that she "would do whatever it took to make things right." She also said that, although she "knew that she was * * * responsible [for A's injuries] right after the doctors told her that [those injuries were] from shaking," she had lied because she was "scared" and because the Criders were present. At the conclusion of the interview, mother signed a written statement consistent with her statements to Holladay and Young. In that statement, she wrote that she was "stressed and stretched to the top" and that she had "unintentionally [and] out of frustration shook [A] in a rough front to back jerking-motion, only for a few seconds."

Three days later, mother participated in a family decision meeting with the Department of Social and Health Services in Vancouver and a representative of Washington Child Protective Services. A was taken into protective custody at that time and placed in a foster home for medically fragile children.[2]

On May 1, at mother's request, Holladay spoke with mother a second time. Mother told Holladay that "she felt like [he] had bullied her * * * into giving what she considered a confession" and that her written statement "was not the truth." She demanded that Holladay reinterview her and administer a polygraph. Holladay arranged for Detective Buckner of the Clark County Sheriff's Office to administer the procedure.

One week later, Buckner met with mother and administered the polygraph. Although the results of the exam are not in the record because they are inadmissible, the record discloses that Buckner went over her statement "paragraph by paragraph" to "give her an opportunity to tell [him] what she agreed or disagreed with." Mother indicated that the paragraph in which she had stated that she had shaken A was not true; she insisted to Buckner that she had never done so. After the polygraph, mother began to cry and told Buckner that "she had shaken [A], but not * * * that

---

[2] Washington Child Protective Services filed a dependency petition after the family decision meeting; the case was ultimately transferred to Oregon, however, because Oregon had "greater jurisdictional contacts with the family."

hard," again demonstrating with her hands. She said that she had "been up most of the night with [A], he was teething, he had just gotten over a cold, he'd been crying, [and] she was frustrated with him, [so] she picked him up out of the exerciser" and "shook him, over her head." Mother stated that she was "sorry for what had happened."

After meeting with Buckner, mother contacted Holladay. She "apologized * * * for making statements that [he] had bullied her," informed him that she "was accepting responsibilit[y] for her actions," and stated that she "just wanted to know what was going to happen next."

On June 1, DHS filed a dependency petition alleging that A was at risk of harm because mother had (1) "inflicted significant and potentially life threatening injury to [A]," (2) "failed to seek appropriate medical attention for [A] and failed to fulfill her obligation as his parent and primary care provider," and (3) "exhibited behaviors that pose a grave and imminent threat" to A's safety. On October 8, DHS held a settlement conference. At that conference, mother signed an admission that she was "not a placement resource" for A "because of [the] pending criminal charges." Based on that admission, the court issued a judgment asserting jurisdiction over A. As part of the judgment, mother agreed to participate in a psychological evaluation. The court also issued a judgment of dependency disposition that called for proceeding with a plan for adoption, which mother did not contest. On October 15, DHS filed a petition to terminate mother's parental rights to A.

Mother participated in a psychological evaluation on December 12, 2007, with licensed clinical psychologist Sorenson. He expressed concern about mother's inability to evaluate potential dangers or risks to A, particularly in light of her quickness "to discount concerns that were raised," as demonstrated by, among other things, her statement that A's bruise inflicted by McCready had been "very small" and accidental and her statement that A's subdural hematoma was a "very small" and "very mild" injury that "should not be a cause of serious concern." Sorenson testified that he was "[s]ignificantly concerned about her ability to evaluate the danger that might be present from other people" because she

"would be disinclined to believe that somebody presented a serious concern and more apt to expect that things would be fine, even if there's evidence of reasons for concern or doubts." On the positive side, Sorenson noted that mother had been "supporting herself without marked difficulty since moving out of her mother's home," "relayed remarkably detailed and appropriate parenting strategies," and had "a basic level of parenting knowledge expected of first time parents." He also stated that mother's "defensiveness may be nothing more than a result of her current legal problems"—always a concern when a parent is evaluated as part of a termination proceeding.

Sorenson concluded that, should mother be found responsible for A's injuries, the danger that A will again be physically abused is "substantial" given mother's inability "to identify potential concerns and problems" and the likelihood that she will again "find herself * * * in a situation where she might be frustrated, angry, or whatever had led [her to] shake or react aggressively with [A]." He further concluded that, should mother be found responsible for A's injuries, "prognosis for change is poor" due to mother's unwillingness "to accept any need to modify her own behavior" and the likelihood that such unwillingness would "disrupt intervention and protective efforts." Sorenson recommended that mother engage in individual counseling. He testified that, should mother be found responsible for A's injuries, and assuming, in such circumstances, that she accepts responsibility, mother would need to "actively engage" in counseling for a minimum of six months, identifying potential stressors and the circumstances that led her to shake A, before it would be appropriate to consider A's transition back into the home.

By April, mother had not yet begun individual counseling as recommended in Sorenson's December 31, 2007, report. Although her DHS caseworker, Erickson, discussed Sorenson's counseling recommendation with mother in January 2008, informed mother that a referral was not needed, and contacted mother several times thereafter to inquire whether she had begun counseling, mother testified at trial in April that she had just recently scheduled her first counseling session.

Mother did, however, "faithful[ly]" attend scheduled weekly visits with A. During those visits, she was "appropriate" with him, provided "guidance and direction" consistent with his age, brought food, "engage[d] with [A]," showed "love and affection," and regularly brought A appropriate clothing of "good quality" and other appropriate gifts. A was "happy to see" mother and "greet[ed] her with a hug and smiles."

At the time of trial, mother was living in an apartment in Albany with a roommate; several witnesses, including Erickson, testified that mother's apartment was very clean and appropriate for A. Mother was employed full time as a claims representative, earning $9.90 per hour, and had health insurance through that position. She faced criminal prosecution in Washington, where the shaking of A was alleged to have occurred; that trial was scheduled for June 2008. Whether that trial occurred and, if so, its outcome, are not in the record.

Although A's foster parent was unwilling to adopt him, both the Criders and Robison (mother's mother) wished to be considered as adoptive placements; DHS, however, had not yet designated an adoptive home. Since A's medical foster care placement, he has had one brain scan and has not required any other specialized medical care.

The termination proceeding occurred from April 28 to April 30, 2008, approximately one year after A was removed from mother's care. Erickson testified that adoption was in A's best interest "[d]ue to the safety risk if he were [to be] placed with his mother." A's attorney, in contrast, opposed termination of mother's parental rights on the basis that A was not in a permanent placement and in order to "give [mother] an opportunity to see if counseling can address the issues, and see if she can change, and then revisit this issue six months down the road." As noted above, the court ultimately terminated mother's parental rights to A based on ORS 419B.502 ("extreme conduct," set out below) and ORS 419B.504 (condition or conduct detrimental to child, unlikely to change). Because we agree that the state proved its case under ORS 419B.502, we do not discuss the court's findings or conclusions regarding ORS 419B.504 except to note that

several of the allegations in the state's petition relevant to that statute were quite clearly not proved.[3]

■        With respect to ORS 419B.502, the state's petition alleged:

> "The mother is unfit under ORS 419B.502 by reason of the following extreme conduct toward a child:
>
> "(a)   Abuse or neglect by the parent of a child resulting in serious physical injury."

ORS 419B.502 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of a single or recurrent incident of extreme conduct toward any child. In such case, no efforts need to be made by available social agencies to help the parent adjust the conduct in order to make it possible for the child or ward to safely return home within a reasonable amount of time. In determining extreme conduct, the court shall consider the following:
>
> "* * * * *
>
> "(3)   Abuse or neglect by the parent of any child resulting in death or serious physical injury."

The Supreme Court has stated that, unlike ORS 419B.504, ORS 419B.502 "provide[s] a procedure for terminating parental rights based upon past conduct, even when the parent might be a 'fit' parent at the time of the termination proceeding" and "even if the court determines that the conduct

---

[3] For example, the record is devoid of evidence that mother failed to maintain a suitable living situation for A; that she failed to learn or assume parenting skills sufficient to provide A a safe and stable home; that she mentally, emotionally, or psychologically abused A; or that she suffered from an emotional illness, mental illness, deficiency, or defect, or a lack of impulse rendering her incapable of providing care for extended periods of time, as alleged in the state's petition. Rather, the evidence shows that mother was employed full time, maintained a clean and appropriate home for A, and possessed adequate parenting skills and knowledge of appropriate parenting strategies. Furthermore, although Sorenson noted in his evaluation that mother was suffering from mild anxiety and depression and displayed below-average cognitive functioning, resulting in "somewhat slowed learning and communication skills," he also stated that mother's anxiety and depression "appear[ ] largely a result of the events leading to Child Welfare intervention" and "are not believed to have contribute[d] to the problem events at issue (*e.g.*, leading to poor judgment on her part)"; and that mother's "[below-average cognitive] functioning * * * would not likely limit her ability to parent children."

will not recur." *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 448-49, 134 P3d 940 (2006). "[I]f the requisites of ORS 419B.502 are satisfied, the court must then determine whether termination is in the best interest of the child[ ]." *State ex rel Dept. of Human Services v. Keeton*, 205 Or App 570, 584, 135 P3d 378 (2006) (citing ORS 419B.500).

Mother argues that, "[w]ithout some evidence as to the timing of the injury, there was not clear and convincing evidence that mother caused serious injury by shaking [A]," because "many different adults other than mother cared for [A] in the three days prior to his admission to the hospital with a subdural hematoma." Mother also contends that she admitted to only "a few seconds of back and forth movement" and "repeatedly denied any forceful shaking of [A] of the kind that the medical experts testified would be required to cause [A's] injuries."

We conclude that the record establishes, by clear and convincing evidence, that mother shook A, causing A serious physical injury, and that such conduct constitutes "extreme conduct" for purposes of ORS 419B.502. *See State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005) (under "clear and convincing evidence" standard, court must find that the evidence establishes that the truth of the facts asserted is "highly probable"). Mother twice admitted to police and to Jamie that she had shaken A on April 23, 2007, and Jamie testified that A began behaving strangely and appeared lethargic that afternoon—before he was in the care of the Criders or Troupe. Mother admitted to police that that she had shaken A *"hard* a couple of times" and "in a *rough* front to back jerking-motion." (Emphasis added.) Moreover, mother offers no alternative explanation for A's injuries. Combined with the expert testimony presented at trial that A's injuries were consistent with shaking, that evidence is sufficient to establish a high probability that mother's shaking of A caused A's injuries. Furthermore, on appeal, mother does not dispute that those injuries, which Skinner testified were "serious" and "life threatening," constitute "serious physical injury." We thus conclude that the trial court did not err in finding that mother had engaged in an incident of extreme conduct toward A under ORS 419B.502(3), thereby rendering her unfit.

■      The question remains whether termination of mother's parental rights is in A's "best interest." ORS 419B.500. Mother argues that

> "there is no clear and convincing evidence that it was in the best interest of [A] to terminate mother's rights when the evidence was that [A] was not in an adoptive home, mother had demonstrated many good child care skills, mother was young, and mother had not engaged nor could she fully engage in counseling pending resolution of her criminal case."

Without disparaging mother's positive qualities, we nonetheless disagree. Given mother's denial of responsibility for A's injuries, her failure to seek prompt medical care for A, her unwillingness to accept the need to modify her behavior, her inclusion of a known abuser on the list of people who could visit A in the hospital, her inability to cope with stressful situations, her failure to promptly engage in counseling, her minimization of A's "life threatening" injuries as "mild," "small," and "not * * * a cause of serious concern," and the fact that three of mother's relatives wish to adopt A, we conclude that A's best interest will be served if he is freed for adoption.

In a second assignment of error, mother asserts that the trial court should have allowed mother's pretrial motion for a continuance and motion at trial to keep the record open to allow mother time to obtain additional testimony relating to the timing of A's injuries. The following facts are relevant to that assignment. Before trial, mother filed a motion for a continuance on the ground that she had recently located an osteopath, Dr. Jollo, who could provide expert testimony regarding when A's injuries occurred. In an affidavit in support of that motion, mother stated that Jollo would be out of the country during the scheduled trial dates and that "continuing [the] matter to allow for an opportunity for Doctor Jollo to review all the medical records and testify at trial is necessary for [mother] to receive a constitutionally adequate defense." DHS objected to the motion and offered to depose Jollo before the trial. The trial court denied mother's motion for a continuance. Jollo was never deposed, nor did mother request that such a deposition occur.

■■    After each side had presented its evidence at the termination trial, mother moved to keep the record open to allow Jollo to submit testimony. The following colloquy transpired:

"THE COURT:  * * * [W]hat's he going to testify to? * * *

"[MOTHER'S ATTORNEY]:  * * * [T]o a certain extent it's hard to know exactly what he would testify to. He has reviewed part of the record, part of the medical evidence. There was some other medical evidence he wanted to have gathered that hasn't been gathered yet, because I didn't know it was relevant before I talked to him. But he can testify based upon he'd give timing of when he believed the injury occurred. So he can testify to that.

"THE COURT:  And you believe that that testimony would be substantially inconsistent with the testimony the Court's already heard?

"[MOTHER'S ATTORNEY]:  Well I don't think * * * any of the doctors testified as to the timing. * * *

"THE COURT:  Okay. And is the timing—could the timing issue essentially rule Mother out as the cause of the injury?

"[MOTHER'S ATTORNEY]:  Yes, Your Honor. Assuming all the other documentation as he reviews it would back that."

In response to DHS's objection that it had offered to depose Jollo before the termination trial, mother's attorney responded that Jollo "wasn't available to be deposed because he wasn't prepared at that point in time." The court ultimately denied mother's motion, stating that mother had failed to demonstrate that

"[Jollo] has any experience, training, or specialization in the areas that would bear on this case. He's not a pediatrician, he's not worked in an emergency, so it really does seem pretty thin that he's going to have an opinion which is going to be so significant that it would outweigh all of the medical testimony we've heard now from all the experts.

"* * * I will not hold the record open for a highly skeptical witness, basically. It's highly skeptical that he's gonna be significant."

We review the trial court's denial of mother's motions for a continuance and to keep the record open for an abuse of discretion. *See State ex rel SOSCF v. Thomas*, 170 Or App 383, 385, 391-92, 12 P3d 537 (2000) (reviewing party's request at trial to continue trial because party was not prepared to proceed for an abuse of discretion); *State ex rel Juv. Dept. v. Mohamed*, 53 Or App 407, 411, 632 P2d 31 (1981) ("Generally, it is within the sound discretion of the trial judge to grant a continuance in termination proceedings."). Those rulings will not be overturned without a showing of both an abuse of discretion and prejudice to the moving party as a result of the court's denial. *State v. Beaty*, 127 Or App 448, 456, 873 P2d 385, *rev den*, 319 Or 406 (1994). A court abuses its discretion when its decision is not within the range of legally permissible choices, *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000), or exceeds the bounds of reason, *Ramsey v. Thompson*, 162 Or App 139, 144-45, 986 P2d 54 (1999), *rev den*, 329 Or 589 (2000). Here, mother's counsel stated that it was "hard to know exactly what [Jollo] would testify to," that Jollo had reviewed only "part of the medical evidence," and that the substance of Jollo's testimony turned on his review of "all the other documentation." Under those circumstances, it is impossible to determine whether mother suffered prejudice as a result of the trial court's decision, and we cannot say that the court abused its discretion in denying mother's motions on the basis that the value of Jollo's testimony was highly speculative.

Affirmed.