Submitted April 26, 2016, affirmed May 10, petition for review denied October 19, 2017 (362 Or 94)

In the Matter of N. M. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. P.,
*Appellant.*

Josephine County Circuit Court
100118J;
Petition Number 100118J04;
A160549 (Control)

In the Matter of N. J. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. N. P.,
*Appellant.*

Josephine County Circuit Court
110064J;
Petition Number 110064J04;
A160548

396 P3d 278

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## DUNCAN, P. J.

In this termination of parental rights case, father appeals the juvenile court's judgment terminating his parental rights to his daughter and son. Father asserts that the juvenile court erred in excluding, as irrelevant, evidence father offered to establish the children's paternal grandfather's availability and suitability as a guardian. Father also asserts that the juvenile court erred in concluding that the Department of Human Services (DHS) established, as required for termination of father's parental rights, that, with respect to each child, (1) father was unfit, (2) the child could not be reintegrated into father's home within a reasonable period of time, and (3) termination of father's parental rights was in the child's best interest. We conclude that the juvenile court erred in excluding the evidence. However, on *de novo* review, ORS 19.415(3)(a), after considering all of the evidence in the record—including the evidence father submitted as an offer of proof regarding grandfather's availability and suitability as a guardian—we conclude that DHS proved that the requirements for termination of father's parental rights had been met. Therefore, we affirm.

The juvenile court has asserted dependency jurisdiction over the children multiple times since daughter was nine months old, in 2010, and since son was a few weeks old, in 2011. Most recently, the court asserted jurisdiction over the children in August 2012, based on parents' substance abuse and domestic violence, father's criminal activity, and mother's mental health. DHS placed the children in nonrelative foster care. In September 2013, the children were placed with mother at a residential treatment center, but after a domestic violence incident between the parents in November 2013, DHS removed the children from mother's care and placed them back into foster care with the foster parents who had cared for them previously. In March 2014, father was imprisoned for a probation violation related to that domestic violence incident.

At the time of the termination trial in August 2015, daughter was five years old and son was four years old. Both children had significant behavioral issues, which required counseling, and daughter also had attachment problems,

which weekly therapy did not appear to be helping. Father was incarcerated and expected to be released in January 2016, to a 90-day transitional housing program.

Because father's challenge to the juvenile court's exclusion of evidence relates to arguments raised and evidence presented at earlier proceedings, we also recount the relevant procedural facts.

In September 2014, the juvenile court held a permanency hearing where father argued that the children's permanent plans should be changed to guardianship, with grandfather as guardian. DHS argued against guardianship and sought to change the plans to adoption. The court changed the children's plans to adoption on September 24, 2014. Father appealed the permanency judgments, and we affirmed without opinion. *Dept. of Human Services v. C. P.*, 271 Or App 590, 354 P3d 774, *rev den*, 358 Or 145 (2015).

Five days after the permanency hearing, on September 29, 2014, DHS filed petitions to terminate father's parental rights to the children pursuant to ORS 419B.504, which provides for termination of a parent's rights if the parent is "unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change."[1]

In February 2015, father moved to dismiss jurisdiction, asserting that grandfather's availability to care for the children eliminated the bases for jurisdiction because, in grandfather's care, the children would not be exposed to a current threat of serious loss or injury. At a hearing on the motion to dismiss in July 2015, father presented the testimony of a mental health therapist who had assessed grandfather's potential parenting capacity in 2013, as well as the report that the therapist had prepared in conjunction

---

[1] The petitions also sought termination of father's parental rights pursuant to ORS 419B.506 "on the grounds he has failed or neglected * * * to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition[.]" However, the juvenile court ultimately terminated father's parental rights pursuant only to ORS 419B.504.

with that assessment. In particular, the therapist testified that, in 2013, grandfather had presented as an adequate caregiver, and that, although he was not concerned that grandfather would pose a risk to the children's welfare, he was concerned "about [grandfather's] capacity to maintain boundaries strong enough to keep his own children out of the grandchildren's lives without appropriate supervision and appropriate * * * safety processes in place." In addition to the therapist, grandfather testified at the hearing. Grandfather stated that he had taken a foster care class and parenting classes, and he described his mental, physical, and financial abilities to care for the children. Father also offered, as exhibits, DHS case notes from supervised visits that father and grandfather had had with the children between December 2012 and April 2015, and forms through which father had delegated his guardian powers and parental authority to grandfather. For its part, DHS presented a caseworker, who testified that DHS was concerned about placing the children with grandfather because of doubts about his ability to "set healthy boundaries with the parents." The juvenile court denied father's motion to dismiss, and father appealed.

While father's appeal of the denial of his motion to dismiss was pending, the juvenile court conducted the termination trial in August 2015. Before the trial, the juvenile court excluded parts of the record from the motion to dismiss proceedings. Father argued against exclusion of the evidence, asserting that parts of the record regarding grandfather's fitness as a guardian or potential adoptive placement were relevant to whether termination of his parental rights was in the children's best interest. The court excluded the evidence but allowed those parts of the record to be admitted in the termination proceedings as an offer of proof. Following the trial, the juvenile court terminated parents' parental rights.[2]

---

[2] With respect to father, the court found (1) that father was unfit due to the following conduct or conditions:

"a) Criminal conduct that impairs [father's] ability to provide adequate care for the child[ren].

"b) Incarceration that impairs [father's] availability to provide adequate care for the child[ren].

After the juvenile court terminated father's parental rights, we issued our opinion in father's appeal challenging the juvenile court's denial of his motion to dismiss. In that opinion, *Dept. of Human Services v. C. P.*, 281 Or App 10, 19, 383 P3d 390 (2016), we affirmed the court's denial of father's motion. We explained that, in denying father's motion, the juvenile court "implicitly concluded that father's evidence regarding grandfather's ability to ameliorate the risk to the children was not persuasive[,]" and we concluded that "there [was] legally sufficient evidence to support the juvenile court's determination." *Id.* at 19. We reasoned:

"Of particular importance, there was evidence that grandfather had difficulty setting or maintaining 'boundaries' with parents. Given that parents' inability to safely parent the children was undisputed, evidence that grandfather would have difficulty protecting the children from the risks posed by parents if the juvenile court dismissed jurisdiction was sufficient to support the juvenile court's determination that the children would be at a current risk of harm from the original jurisdictional bases."

*Id.*

Now, on appeal from the juvenile court's judgment terminating father's parental rights, father argues that the court erred by excluding the evidence of grandfather's fitness

---

"c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"d) Exposure of the child[ren] to domestic violence.

"e) Failure to present a viable plan for the return of the child[ren] to [father's] care and custody.

"f) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render [father] incapable of providing care for extended periods of time.

"g) Physical and emotional neglect of the child[ren].

"h) Lack of effort to adjust [father's] circumstances, conduct or conditions to make return of the child[ren] to [father] possible.

"i) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

(2) that the children could not be reintegrated into father's home within a reasonable period of time, and (3) that termination of father's parental rights was in the children's best interest.

Mother did not appear for the termination trial and has not appealed the juvenile court's judgment terminating her parental rights.

as a guardian for the children and that it erred by concluding that DHS had established that the requirements for termination were met. We address those contentions in turn.

Father asserted at trial, as he does on appeal, that the evidence regarding grandfather was relevant to the issue of whether termination was in the best interest of the children. Specifically, at trial, father explained that the evidence was relevant "because it gives the court an alternative * * * to termination of parental rights in order to maintain parental contact between the children and their father[,]" which, he contended, was in their best interest. Father also cited our opinion in *Dept. of Human Services v. M. P.-P.*, 272 Or App 502, 356 P3d 1135 (2015), as support for his argument. In that case, we reversed the juvenile court's judgment terminating the mother's parental rights because the "overwhelming evidence" in the record indicated that the child was strongly bonded to his mother such that termination would harm the child. *Id.* at 504-05 (highlighting a psychologist's testimony that the risk of not returning the child "to his mother is that he will continue to mourn his loss in an extended manner which could interfere with his ability to attach to another family"). Under those circumstances, we determined that an alternative to termination "that accommodates a continuing relationship with [the] mother would serve [the child's] best interest." *Id.* at 504. Thus, father's argument, which he made at trial and renews on appeal, is that the evidence is relevant because it supports his theory that, as in *M. P.-P.*, termination of his parental rights would harm his children to such an extent that an alternative to termination, such as guardianship with grandfather, is in the children's best interest.

Whether evidence is relevant is a legal question. *Dept. of Human Services v. J. M.*, 262 Or App 133, 135, 325 P3d 35 (2014) (citing *State v. Carreiro*, 185 Or App 19, 22, 57 P3d 910 (2002)). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. *State ex rel Juv. Dept. v. Ashley*, 312 Or 169, 173-74, 818 P2d 1270 (1991) (the Oregon Evidence Code applies to a proceeding to terminate parental rights).

"[W]hether termination of one parent's rights is appropriate must be determined based on an assessment of the particular circumstances." *State ex rel Juv. Dept. v. Proctor*, 169 Or App 606, 611, 10 P3d 332 (2000). As we summarized in *State ex rel SOSCF v. Thomas*, 170 Or App 383, 398, 12 P3d 537 (2000), "[i]n assessing the best interests of a child on appeal, we have considered the grounds on which we have found the parent unfit and then weighed the benefits against risks involved in not terminating that parent's rights." As a general matter, when a parent opposes termination on the ground that it is not in a child's best interest because severing the parent's legal connection to the child will be detrimental to the child, evidence of an alternative to termination that will preserve that legal connection is relevant to whether termination is in the child's best interest. *See, e.g., Proctor*, 169 Or App at 611 (considering whether "legal mechanisms to protect [the] child that fall short of complete severance of [the] father's parental rights[,]" which would allow the child to retain the financial benefits of his legal relationship with his father, were sufficient to justify not terminating the father's rights).

DHS asserts that the juvenile court did not err because "[t]he juvenile court had previously changed the permanency plan for the children to adoption on September 24, 2014[,]" after finding that "guardianship with the grandfather was not an appropriate plan for the children[,]" which meant that, "at the time of the termination trial, guardianship by [grandfather] was not an option for the children."

Whether evidence is relevant does not depend on whether an argument based upon it will succeed in the end. *See Masood v. Safeco Ins. Co. of Oregon*, 275 Or App 315, 352, 365 P3d 540 (2015), *rev den*, 359 Or 525 (2016) (asserting that OEC 401 establishes a "very low" threshold for relevance). Here, father argued that he and his children were bonded and that termination would sever their relationship to the children's detriment. Given that argument, evidence regarding the existence of an alternative to termination, which would maintain their bond while reducing the risks involved in not terminating father's rights, was relevant to the juvenile court's best interest analysis. Moreover, the state's reliance on the juvenile court's September 2014

permanency decision fails to account for changes in circumstances between that decision and the August 2015 permanency hearing. Thus, we conclude that the juvenile court erred in excluding the evidence.[3]

Because the juvenile court erred in excluding father's evidence, on *de novo* review, we must consider that evidence, which is in the record as an offer of proof, when determining anew whether to terminate father's parental rights. ORS 19.415(3)(a); *Dept. of Human Services v. R. K.*, 271 Or App 83, 89, 351 P3d 68, *rev den*, 357 Or 640 (2015) (we determine anew whether to terminate the parent's rights, and are not bound by the juvenile court's findings of fact, but we give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony" (quotations omitted)). On *de novo* review, we determine that DHS established the requirements for terminating father's parental rights.

To terminate a parent's rights on the basis of unfitness under ORS 419B.504, a court must find that the parent is "unfit by reason of conduct or condition seriously detrimental to the child" and that the child cannot be reintegrated into the parent's home "within a reasonable time due to conduct or conditions not likely to change." DHS must establish these statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1).

The evidence in the record proves by clear and convincing evidence that, at the time of the termination trial, father's personality disorder, in combination with other long-standing conditions, was seriously detrimental to the children. In late 2012 and early 2013, father participated in a psychological evaluation which revealed that his

---

[3] To be clear, we note that, at a termination trial, the juvenile court is not making a placement decision. Thus, in this case, the juvenile court was not called upon, in the termination trial, to determine whether the children should be placed with grandfather or their foster parents. Instead, it was only to determine whether the requirements for termination of father's rights—including whether termination was in the children's best interest—had been met. As explained, evidence regarding the importance of maintaining a legal connection to the parent and whether there are ways that can be achieved is relevant to the court's best interest determination.

personality traits included "high levels of attention neediness, egocentrism, criminality, aggression, and some instability in [his] personal structure that led him to be a little bit more relationship dependent." At trial, Dr. Morrell, who conducted the evaluation, testified that, because of these traits, father has a tendency "to take care of himself rather than * * * to prioritize the welfare of a child[.]" In particular, Morrell noted that father "had a lot of need for attention and affection, * * * tended to be fairly self-absorbed, and * * * was relatively insecure." This puts father at risk for toxic relationships, such as his relationship with mother, where he "loses himself." The evidence presented at trial, including father's own testimony, demonstrated that father's combination of conditions have been detrimental to the children by driving behaviors that have exposed the children to domestic violence and neglect. These traumatic experiences have contributed to the children's severe behavioral issues.

We acknowledge that while in prison father has demonstrated a commitment to changing his actions. At the termination trial, father testified that he had abstained from using controlled substances in prison, had participated in a number of programs, including drug treatment and relationship and parenting classes, and that his relationship with mother was over. However, father's detrimental behaviors were manifestations of his personality disorder, which Morrell testified is "intractable" and, therefore, not likely to change. Moreover, although Morrell testified that father could change the narcissistic and antisocial aspects of his personality through a "model reasoning" program, and although he testified that father could eventually become a minimally adequate parent for *a* child, he declined to estimate the period of time that father would need to be minimally adequate to safely care for *these* children. Morrell stated, "I think that's unknown[.] * * * [T]he best answer I can give * * * is more probably than not I don't think [father] would be able to rise to the level of caregiving for special needs [children]." He explained that, even if father were able to learn to put his children's needs before his own and to abstain from substance abuse and toxic relationships,

"this is an individual who under the best of circumstances, with probably very good intentions, with a normal child

might be at the beginning phases of seeing if he can do something, but not with these children under these circumstances with what he needs to do in order to develop and mature. * * * He means well. I just think he's over his head."

Given the long-standing and intractable nature of father's personality disorder and the high probability that father will not be able to safely parent the children, it is improbable that the children can be integrated into father's care within a reasonable time. *See, e.g., R. K.*, 271 Or App at 93 (parent's recent progress in treatment and commitment to change does not overcome other evidence of unfitness and, considering all the circumstances, it was improbable the child could be returned to the parent's care within a reasonable time).

Even if the department meets its burden to prove the parent's unfitness, the juvenile court is authorized to terminate the parent's parental rights only if the department proves that permanently severing the legal relationship between the child and the parent is in the child's best interest. ORS 419B.500 (the purpose of the termination of parental rights is to free "the ward for adoption if the court finds it is in the best interest of the ward"); *M. P.-P.*, 272 Or App at 504 (determining whether a parent's parental rights should be terminated "requires an additional consideration [beyond unfitness]—the best interest of the child"); *Thomas*, 170 Or App at 396 ("The best-interests determination can prevent termination, even if the statutory grounds for termination are established.").

Here, DHS has proved that the termination of father's parental rights is in the children's best interest. As noted above, we consider the children's interest in maintaining a legal connection to father and the children's interest in being freed for adoption in the context of the grounds on which we have found father unfit. *Thomas*, 170 Or App at 398. Here, the children have spent most of their lives out of father's care and are not strongly bonded to him. We acknowledge that, while in custody, father attempted to stay in contact with the children, and, during that same time period, grandfather continued to build his relationship with the children through supervised visits. But, the psychologists who evaluated the children testified that, with respect to

each child, the child's interview did not reveal that the child was bonded to father or grandfather. Furthermore, although both psychologists testified that the children share a strong sibling bond, the children are adoptable and DHS has identified their current placement as an adoptive resource where they can be adopted together. Thus, this case is distinguishable from *M.P.-P.*, where the child's strong attachment to his mother posed a significant threat to the child if the mother was not allowed contact with him. 281 Or App at 505.

Moreover, the children's interest in being freed for adoption is great. Both children have an immediate need for permanency. Dr. Eagle, who evaluated daughter, testified that she "did not feel like [daughter] was going to be able to make progress on [her] pretty significant emotional and behavioral issues" unless she were provided "stability, permanency and consistent caregiving." Similarly, Dr. Sage, who evaluated son, testified that son requires a caregiver who could "provide a significant amount of one-on-one time" and that he "needs permanency now." Those are needs that neither father nor grandfather can meet. Father has not completed the services intended to prepare him for his safe reunification with his children, and DHS estimated that it would take him at least nine months after his release from prison, 11 months from the termination trial, to engage in the services and show the progress needed to be reunited with them. At the same time, father has a history of failed treatment and a personality disorder that causes him to put his own needs, especially those related to his romantic relationships, before the needs of his children, and that personality disorder is unlikely to change. Thus, even if the children could wait 11 months for father to show progress, there is a substantial risk that they could again be removed from father's home. Another failed reunification would be detrimental to the children, particularly to daughter. Eagle testified that daughter "is especially vulnerable" to a failed reunification because "she already has pretty significant problems with attachments and forming relationships," and that "the risk to [daughter]" posed by another reunification, "followed by an additional disruption [is] very high."

We recognize that grandfather has made a sincere effort to prepare to care for the children, including switching

his work schedule as a truck driver from overnight trips to day shifts. However, even with this change at work, grandfather will be out of the house during the day for most of the week and plans to delegate childcare to his elderly mother, the children's great-grandmother. Given the children's young ages and need for significant individual attention, grandfather's childcare plan will not be able to meet the children's needs. And, given grandfather's difficulty setting and sustaining boundaries, it is unlikely that he would be able to protect the children from the harms posed by father.

For all of the reasons discussed above, we are persuaded that DHS has proved by clear and convincing evidence that termination of father's parental rights is in the children's best interest and we affirm the decision of the juvenile court.

Affirmed.