Argued and submitted June 12, affirmed August 26, 2020

In the Matter of A. G. M. H.,
aka A. G. H., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*

*v.*

M. H.,
*Respondent.*

Marion County Circuit Court
19JU05583; A173126

473 P3d 1152

The Department of Human Services (DHS) appeals from a judgment of the juvenile court denying its petition to terminate mother's parental rights to her child. The juvenile court determined that mother was unfit; however, it also determined that DHS had not established that freeing child for adoption was in child's best interest. On appeal, DHS argues that the court impermissibly considered child's likely adoptive placement in its best-interest analysis and requests that the Court of Appeals determine, on *de novo* review, that mother's parental rights should be terminated. *Held*: The juvenile court did not legally err in its analysis. If a child's likely adoptive placement informs whether freeing that child for adoption is in the child's best interest due to the child's particular needs and circumstances, then evidence of where, and with whom, that placement may be is a permissible consideration for the court. Further, on *de novo* review of the record, DHS did not carry its burden to demonstrate by clear and convincing evidence that freeing child for adoption was in his best interest.

Affirmed.

Lindsay R. Partridge, Judge.

Inge D. Wells, Assistant Attorney General, argued the cause for appellant. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Sarah Peterson, Deputy Public Defender, argued the cause for respondent. Also on the brief was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

In this termination of parental rights proceeding, the Department of Human Services (DHS) appeals from a judgment of the juvenile court denying its petition to terminate mother's parental rights to her child. The juvenile court determined that mother was unfit and that it was improbable that her child could be returned to her care within a reasonable time, as required to terminate parental rights under ORS 419B.504. However, the juvenile court also determined that DHS had not established that freeing child for adoption was in child's best interest, as required by ORS 419B.500, and thus denied DHS's petition to terminate mother's parental rights. On appeal, DHS argues that the juvenile court impermissibly considered child's likely adoptive placement in its best-interest analysis and requests that we, on *de novo* review, determine that mother's parental rights should be terminated. We conclude that the juvenile court did not legally err in how it conducted its analysis and, on *de novo* review pursuant to ORS 19.415(3)(a), we affirm the judgment denying the petition to terminate mother's parental rights.

To grant a petition to terminate parental rights, the juvenile court must find, by clear and convincing evidence, that the parent is "unfit by reason of conduct or condition seriously detrimental to the child" and that "integration of the child *** into the home of the parent *** is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504.[1] In addition, the court must find, by clear and convincing evidence, that freeing the child for adoption is in the child's best interest. ORS 419B.500.[2] In this case, the only question presented to us

---

[1] ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

[2] ORS 419B.500 provides:

"The parental rights of the parents of a ward may be terminated as provided in this section and ORS 419B.502 to 419B.524, only upon a petition

on appeal is whether freeing child for adoption is in his best interest.[3] Thus, our *de novo* standard "requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [child's] best interest." *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). In addition, because DHS must establish the child's best interest by clear and convincing evidence, "we must be persuaded by the evidence that it is highly probable that termination of mother's parental rights is in [child's] best interest." *Id.*

In this case, the juvenile court held a two-day termination trial and then, about a month later, another final hearing related solely to child's best interest. Because that procedure is relevant to the legal issue we must address on appeal, we recount the evidence relevant to the best-interest issue that was presented at those two hearings, beginning with the evidence offered at the two-day trial.

Child, who was five years old at the time of the termination of parental rights proceeding in 2019, was removed from mother's care in December 2016 when he was two and one-half. Between his removal and the termination proceeding, child experienced a total of 12 different placements involving eight or nine different caregivers. In the six and one-half months before the termination proceeding, child was placed with his current foster mother (foster mother), who is a psychiatric nurse and a potential adoptive resource. Additionally, DHS identified maternal relatives in Alaska as a potential adoptive resource and had initiated an Interstate Compact on the Placement of Children (ICPC) study to determine if it would be appropriate to place child with those relatives.

---

filed by the state or the ward for the purpose of freeing the ward for adoption if the court finds it is in the best interest of the ward. If an Indian child is involved, the termination of parental rights must be in compliance with the Indian Child Welfare Act. The rights of one parent may be terminated without affecting the rights of the other parent."

[3] Neither party challenges the juvenile court's determination that mother is unfit and that it is improbable that child could be returned to mother's care within a reasonable time, due to mother's active substance abuse, untreated mental health conditions, and unstable housing.

Child has high needs and exhibits challenging behaviors that can be difficult to manage. He throws tantrums, during which he is unreachable, and also kicks, hits, bites himself, bangs his head against walls, destroys property, and throws things. His challenging and disruptive behaviors are particularly triggered by transitions, including minor transitions such as being told that it is time to move on to a different activity or nearly time to end a therapy appointment, or when he thinks he might be in trouble. He also has a history of issues around toileting.

Dr. Giesick, a clinical psychologist, evaluated child and diagnosed him with an "unspecified trauma and stressor-related disorder," which is a lesser form of post-traumatic stress disorder, and an "adjustment disorder with disturbance in conduct." Child may also have a language disorder. The treatment for stress and adjustment disorders is to end moving a child to different caregivers, stabilize his environment, and address the stress disorder with therapy. Bell, who has served as child's mental health therapist for about a year, also diagnosed him with an "adjustment disorder with mixed disturbance of emotions and conduct."

The consensus at the termination proceeding among child's evaluator, therapist, caregivers, and caseworker was that child requires a caregiver who has a higher level of skills than the average caregiver to meet his needs. He needs consistency, stability, and a caregiver who is flexible in their approach, well-versed in trauma, and who will care for child in the long term. Dr. Giesick testified that a caregiver without the necessary skills would lead to child "develop[ing] a full-blown anxiety disorder" and "an increase in negative conduct with more physicality." Bell also testified that continuing caregiver disruptions for child will lead to him developing long-term trust issues.

With play therapy and two stable placements in a row—the first for nine months with a skilled caregiver and then six and one-half months with foster mother—child has shown improvement such that DHS considers him adoptable. Bell testified that, since his placement with foster mother, child's tantrums are less frequent and less extreme, he is less reactive overall, and he has been able to shift to

more developmentally appropriate issues. She further testified that child is feeling more stable in his environment with foster mother. Dr. Giesick attributed child's improvement to foster mother's therapeutic foster care. Child's maternal grandmother (grandmother) agreed that his behavior has been improving with foster mother. Foster mother testified that child has improved because of the relationship they have established and the approach she uses with him for making transitions.

Child is bonded to both foster mother and grandmother. Bell reported that child identifies foster mother as his family. Additionally, it is undisputed that child and grandmother have a close bond, that she has been the one constant in his life, and that contact between them should continue. They currently have an overnight visit every weekend. Dr. Giesick, in particular, testified that grandmother should stay a part of child's life and that it would be very difficult for child, and could cause a deterioration in behavior, if that contact ceased.

As between mother and child, they love each other, but child's bond to mother is insecure. He does not talk about her to others, including his grandmother, and does not express that he misses her to anyone. Dr. Giesick described that insecure bond this way: "[A]t some level [child] doesn't always view his mom as someone who's going to be there for him and will act in a predictable fashion or do what's in his best interests[.]" However, mother and child are comfortable with each other and child does see her as a good playmate. There was no evidence that mother abused child while he was in her care.

There was also consensus among the witnesses that a permanent, stable placement is required to address child's particular needs. Dr. Giesick testified that it was in child's best interest to be adopted by foster mother. Bell testified that he needs permanency as soon as possible and that any change in routine will be difficult for him. Grandmother testified that she wants him in a stable environment and that foster mother is "really good for him." Child's DHS caseworker, Allbee, testified that child needs to feel like he belongs somewhere with a stable person. Allbee also

testified that she did not discuss guardianship with foster mother because, in her view, it does not provide permanency because there is nothing to stop mother from dissolving it. Allbee also testified that it would be very difficult for child not to see grandmother and that foster mother was an appropriate adoptive resource.

Foster mother wants to adopt child and has been clear with DHS from the beginning that that was her goal. She testified that, if she adopted him, his visits with grandmother would continue. When asked if she was open to a guardianship, foster mother responded that she did not know enough about guardianships and what her rights might be to answer, but also stated that she did not think it would be to child's benefit because he "needs a mother."

As noted, DHS also identified maternal relatives in Alaska as an adoptive resource for child. Grandmother testified that that potential placement was her first cousin and her cousin's husband. Child had met the cousin a few times but had not met the husband. Grandmother agreed that placing child in Alaska would make it difficult for her to visit him.

During DHS's closing argument, the juvenile court asked DHS why it was even considering placing the child in Alaska. DHS responded that child's specific placement was not relevant to whether he should be freed for adoption and also responded that DHS's administrative rules required it to prioritize placement with relatives. DHS asserted that adoption was the only plan that could achieve permanency for child. The court disagreed, stating that other permanent plans are available, and expressed that leaving open the possibility that child would be moved once again if he were freed for adoption does not give child permanency. In closing, mother argued that adoption was not in child's best interest because it was unknown where he would go and what level of contact he would have with grandmother. Child's counsel argued that his best interest was to stay with foster mother and have continuing contact with grandmother, but it was unclear how that best interest could be achieved.

At the close of arguments, the juvenile court found that DHS had demonstrated by clear and convincing evidence that mother was unfit and that child's integration into her home within a reasonable time was improbable, as required by ORS 419B.504. The court then determined that it could not, on the evidence presented, find that freeing child for adoption was in his best interest, as required by ORS 419B.500, unless child was to be adopted by foster mother, because another move was not in his best interest. The court explained:

> "I know that the Court can't say, 'Okay, I'm freeing the child for adoption and this is where you have to place the child,' I agree with that concept that I don't have that authority. What I do have the authority to do is say, based on the record that's before the Court, can I make the finding that it's in the best interests of the child to be freed for adoption?
>
> "I can't make that finding today, because I don't know that the agency won't make a determination that this child is moved to Alaska and then it's another move for the child, it's disruptive from a home that I've heard no evidence is anything but positive, it would impact the ability of the child to have contact with grandma, so under those circumstances I don't believe I can make a finding that that's in the best interests of the child. Now, if somebody were to bring me evidence that says, 'We've got a person designated, this is our adoptive resource, they're not moving to Alaska,['] *** but what I'm [thin]king is that when I've got in front of me that, hey, we may move this kid to Alaska, I can't make a finding that it's in the best interests of the child to free him for adoption. That's the bottom line, so I don't know where that leaves us."

In response, DHS asserted that it was required to consider the relatives in Alaska as an adoptive placement and that foster mother does not qualify as a "current caregiver" under DHS's administrative rules, such that she could be designated as the adoptive resource, until she has been child's caregiver for at least 12 months.[4] The court then stated:

---

[4] We note that DHS did not provide at that point what administrative rules it was relying on for its position. However, on appeal, DHS states in a footnote:

"Sure, but I also know that there's exceptions, and are you telling me that there is no way to take this case to folks at DHS who have the authority to grant an exception and that's not a possibility? I get you don't want to do it, I get that that's not your normal practice, but, you know, I'[m] just going to be flat-out honest with you, I am not going to make a ruling in this case where this five-year-old child[—] I have to worry about this child going to live with strangers again, he's had 12 placements, \*\*\*, so if what you're telling me is that you cannot do that then—and we got to wait another seven months, then what I'm going to invite [the child's attorney and mother's attorney] to do, get together, file a permanent guardianship petition, set it on my docket, and that's the way I'm going to go.

"So you can't have it both ways. Get this done. I'm going to come back in 30 days. If it's not done, then at that point file a permanent guardianship petition \*\*\* and then that's what I'm going to take up. But again I am not going to leave this case with any possibility that this child moves to Alaska, and until you can tell me that's not going to happen, I'm not signing my name on a TPR or judgement."

The parties then reconvened at a continued hearing the following month. At that hearing, Allbee testified that her supervisor told her that DHS could not guarantee adoptive placement with foster mother. She also testified that the Alaskan relatives' ICPC study had been completed, although she had not yet received it, and she understood that it was favorable. When asked by the court if placement in Alaska was in child's best interest, Allbee responded that "it would be difficult for \*\*\* child to move from his current placement to Alaska." She further stated that it was "DHS's position" that adoption was in child's best interest whether it was with relatives in Alaska or with foster mother.

Grandmother testified that she would move to Alaska if child was placed there and that it would be in child's

---

"The department's rules prioritize relatives in the adoption selection process. OAR 413-120-0020. However, a foster parent who has cared for a child 'for at least 12 months' achieves 'current caretaker' status, and is considered on equal footing with relatives when DHS selects an adoptive resource. *Id.*; OAR 413-120-0000(26)."

Because DHS does not rely on those administrative rules for its argument on appeal, we do not discuss them further.

best interest to go to Alaska. She testified that her cousin would be able to help child with his behaviors, because her cousin teaches parenting classes and the couple was always "very good" with their own children and grandchildren. She also testified that child and her cousin had spoken "quite a bit."

Following that testimony, DHS told the court that, if the ICPC study is favorable, then DHS's administrative rules would require it to place child with his relatives in Alaska.

Based on that record, the juvenile court determined that DHS had not shown that adoption was in child's best interest:

> "I can't make a finding at this point that it's in the best interests to terminate, and I struggle with this mightily, but I have the statement of Ms. Allbee saying that I think it's clear, first of all, she didn't really want to answer my question, but, secondly, that it would be difficult for [child] to transition, and then the testimony that I heard earlier in the case had nothing but positive regarding the current placement and the need for stability. I am mindful that the Court is not able to select a placement and adoption, but I have to find that it's in the best interests for an adoption, which in this case what I'm hearing today is that if I grant the termination petition and free the child for adoption, this child in all probability is moving to Alaska. And I have testimony about how disruptive that would be but yet another placement for the child and I can't find that that's in his best interests, and [DHS's] own [best interest] memorandum says the best interests of the child must be of paramount concern. It is of paramount concern.
>
> "I'm not convinced that the plan of adoption and the change of placement is in this child's best interests. And I understand that parties may believe that my legal analysis is incorrect \*\*\* but under the facts that have been presented to this Court, I cannot find that [DHS has] met the burden of proof on that freeing the child for adoption is in [child's] best interests."

The court then entered a judgment denying DHS's petition to terminate mother's parental rights. DHS appeals from that judgment.

We first address the legal issue that DHS raises.[5] On appeal, DHS argues that the juvenile court was not permitted to consider child's ultimate adoptive placement when determining, under ORS 419B.500, whether freeing him for adoption was in his best interest. DHS asserts that when ORS 419B.500 is read in the context of the entire statutory framework and prior case law, it does not permit consideration of an ultimate placement. Specifically, DHS asserts that the legislature did not intend for a placement to be considered because that dispositional determination is made *after* parental rights are terminated, under ORS 419B.527.[6] DHS further argues that its position is supported by prior cases in which we have observed that a juvenile court is not making a final placement decision at a termination trial. *See, e.g.*, *Dept. of Human Services v. C. P.*, 285 Or App 371, 379 n 3, 396 P3d 278, *rev den*, 362 Or 94 (2017) (noting that the juvenile court was not called on in a termination trial to determine whether the children should be placed with their grandfather or their foster parents).

We reject DHS's argument. The statutory scheme nowhere suggests that the legislature intended to prohibit a court from considering a child's potential adoptive placement in determining whether freeing that child for adoption is in the child's best interest. The only statute cited by DHS, ORS 419B.527, simply provides that, after a parent's rights are terminated, the court may place the child with an agency that can consent to the child's adoption and may make any

---

[5] We reject without discussion mother's contention that DHS's arguments about the juvenile court's best-interest ruling are not reviewable.

[6] ORS 419B.527 provides:

"(1) After the entry of an order terminating the rights of the parent or parents of the ward, the court may:

"(a) Place the ward in the legal custody and guardianship of a public or private institution or agency authorized to consent in loco parentis to the adoption of children. An order pursuant to this paragraph is a 'permanent commitment' for the purposes of ORS 109.118, 109.305, 109.321 to 109.330 and 109.350 to 109.390; or

"(b) Make any order directing disposition of the ward that it is empowered to make under this chapter.

"(2) If the rights of only one parent have been terminated, the authority to consent to the adoption of the ward as provided in subsection (1)(a) of this section is effective only with respect to the parent whose rights have been terminated."

other authorized disposition of the child. The statute sets out only the necessary timing for such a placement; it does not restrict the evidence a court may consider in determining whether freeing a child for adoption is in the child's best interest.

Moreover, except in circumstances that do not apply here, ORS 419B.498(1)(a) provides that DHS "shall *simultaneously* file a petition to terminate the parental rights of a child or ward's parents and identify, recruit, process and approve a qualified family for adoption if the child or ward is in [DHS] custody \*\*\*." (Emphasis added.) Under that statute, identifying and approving an adoptive placement is not to occur only *after* a parent's rights are terminated, as DHS suggests, but rather is to occur *simultaneously* with the petition to terminate. That required simultaneous effort suggests that the identified adoptive placement is relevant to the best-interest inquiry in a termination proceeding.

With regard to our case law, contrary to DHS's assertion, we have routinely considered a child's potential identified adoptive placement in determining whether freeing for adoption is in a particular child's best interest. *See, e.g.*, *T. L. M. H.*, 294 Or App at 752 (discussing, as part of the best-interest analysis, whether the child's potential adoptive placement would be willing to facilitate an ongoing relationship with the child's mother, to whom the child was bonded, if her rights were terminated); *Dept. of Human Services v. T. M. M.*, 248 Or App 352, 373, 273 P3d 322, *rev den*, 352 Or 170 (2012) (where five children were bonded to each other and the evidence established that they should stay together, taking into consideration that "[a]ll five children are currently in a foster placement together where they are doing well, and that foster placement is willing to adopt them," to determine that termination was in their best interest); *Dept. of Human Services v. D. M. T.*, 239 Or App 127, 141, 243 P3d 836 (2010), *rev den*, 349 Or 654 (2011) (determining that termination of father's rights was in the best interest of a child who "has stability and a strong bond with his maternal grandmother, who wishes to adopt him, and his emotional health has improved under her care"); *Dept. of Human Services v. R. J. T.*, 229 Or App 619, 641-42, 214 P3d 1, *rev den*, 347 Or 43 (2009) (taking into consideration

that foster parents, who had provided stability for the child and who the child viewed as her parents, wished to adopt the child, in determining that termination was in the child's best interest, even though continuing contact with the mother may be beneficial). The relevance of the likely adoptive placement of a child in the best-interest inquiry does not evaporate when that evidence cuts against DHS's position instead of in favor of that position.

The best-interest inquiry required by ORS 419B.500 is a child-focused inquiry separate from the parent-focused unfitness requirements in ORS 419B.504. *Dept. of Human Services v. T. M. D.*, 365 Or 143, 158, 442 P3d 1100 (2019). The Supreme Court in *T. M. D.* reemphasized the importance of that separate inquiry. In that case, the court rejected DHS's argument and concluded that the statutory scheme does not contain any presumption or preference for termination of a parent's rights—that is, it does not contain a preference for adoption—when the parent is found to be unfit under ORS 419B.504. *Id.* at 161-62. "Rather, ORS 419B.500 requires the juvenile court to determine, from the evidence presented in the termination proceeding, whether termination is in the child's best interest." *Id.* at 162. Further, DHS bears the burden of demonstrating that terminating the parent's rights will serve the child's best interest—that is, DHS carries an affirmative burden; it cannot rely on a lack of evidence that termination would harm the child to meet that burden of proof. *Id.*

The argument that DHS advances here largely suffers from the same defect as its argument in *T. M. D.*: it fails to engage with the burden of proof that DHS carries in termination cases. DHS's burden to prove that freeing a child for adoption is in the child's best interest is dependent on evidence of what is in the best interest of the particular child under that child's circumstances; generalized notions of what is best, in the abstract, do not suffice. *See, e.g.*, *T. L. M. H.*, 294 Or App at 753 ("[T]he juvenile code demands a persuasive factual showing that termination of parental rights to a particular child is in that child's best interest, in view of the particular needs and circumstances of the child."); *Dept. of Human Services v. T. L. B.*, 294 Or

App 514, 533, 432 P3d 343 (2018), *rev den*, 365 Or 556 (2019) ("[A]n undifferentiated assertion that a given child requires permanency as soon as possible provides no child-specific information; it therefore will not satisfy DHS's burden to prove that termination is in a particular child's best interests."); *see also T. M. D.*, 365 Or at 167 (Balmer, J., concurring) ("The application of the 'best interest of the child' standard requires careful attention to the subtleties of a given case, and is for that reason inimical to [] fact-matching between similar cases[.]"). If a child's likely adoptive placement informs whether freeing that child for adoption is in the child's best interest due to the child's particular needs and circumstances, then evidence of where, and with whom, that placement may be is a permissible consideration for the court. That must be; otherwise the court would be engaging in what we have repeatedly said is not permissible— determining whether adoption in the abstract, and not tied to the particular circumstances of the child, is in the child's best interest.

Having resolved the sole legal issue raised by DHS, we turn to whether, on *de novo* review, we are persuaded by clear and convincing evidence that termination of mother's parental rights is in child's best interest. *T. L. M. H.*, 294 Or App at 750. On this record, we are not persuaded that termination is in child's best interest.

The evidence established that child suffers from a stressor disorder and an adjustment disorder that leads to challenging and disruptive behavior when he experiences certain triggers, such as transitions, and that child needs a permanent placement with a skilled caregiver to prevent those disorders and behaviors from developing into life-long difficulties with trust and anxiety. Child has recently improved after two long-term placements in a row with skilled caregivers. In particular, DHS's evaluating psychologist attributed child's improvement to the point that he can be adopted to foster mother's therapeutic care and opined that it was in child's best interest to be adopted *by foster mother*. Similarly, both child's therapist and his caseworker testified that another move would be very difficult for him. The evidence also established that child is bonded to foster mother and to his grandmother, whom he sees for weekly

overnight visits, and that he has a positive, if guarded, relationship with mother.

We reject the notion, advanced by DHS below through counsel and through Allbee's testimony, that permanency can only be achieved through adoption in this case. In *T. M. D.*, the Supreme Court explained that a permanent guardianship can fulfill a child's need for permanency and that adoption is not the only option for doing so. As the court explained in *T. M. D.*, a permanent guardianship is permissible only if the juvenile court finds that the grounds for termination of parental rights are met and finds that it is in the child's best interest that the parent never have physical custody of the child. ORS 419B.365(2), (3). Thus, a permanent guardianship is not a temporary arrangement and, further, a parent cannot seek to vacate it. ORS 419B.368(7). The court also explained in *T. M. D.* that, in that child's case, there was no evidence that the child's need for permanency was a need for *legal* assurance that a court would never change his placement. *T. M. D.*, 365 Or at 165. Rather, the evidence was that the child needed immediate security which could be provided through a permanent guardianship. Similarly, in this case, there was no evidence that child's need for permanency was a legal one; rather, the evidence established that child's need for permanency was a need for placement with a stable and long-term caregiver who had the skills to meet his needs.

In addition, child's strong bond to grandmother has been the one constant in his life, and a disruption in his contact with her would be detrimental to his well-being. DHS did not establish that termination of mother's parental rights would not cause such a disruption. Instead, it asserted that it would not address the question of ongoing contact with grandmother until after termination. And although child's bond with mother is insecure, the relationship is positive, and the record does not establish that severance of that relationship is in his best interest. We do not assume that severing a child's legal relationship with a legally unfit parent is necessary to that child's best interest without evidence.[7]

---

[7] We note that there is mounting evidence in the world of private adoption that continuing contact with a noncustodial biological parent is frequently in

In short, the evidence here established only that it was in child's best interest to stay in his current placement with foster mother as a permanent placement, with continued contact with grandmother and possibly with mother. DHS did not develop a record that supports its argument that, because child needs permanency, adoption, in the abstract, is in his best interest, nor did DHS even attempt to establish that adoption by child's Alaskan relatives—whom he barely knew and whose caregiving skills were scarcely in evidence—would be in child's best interest. Given that the record also established that freeing child for adoption would likely result in DHS placing him with his Alaskan relatives, in part due to a preference under DHS's administrative rules,[8] we are not persuaded that freeing child for adoption in this case, under these circumstances, is in child's best interest.

---

the best interest of children. Such evidence has fueled a trend in the private adoption world toward open adoptions that facilitate continuing contact between adopted children and their birth parents. *See generally* Harold D. Grotevant *et al*, *Contact between Adoptive and Birth Families: Perspectives from the Minnesota Texas Adoption Research Project*, Child Dev Perspective 193 (Sept 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3743089/ (accessed Aug 18, 2020) (longitudinal examination of the consequences of variations in contact arrangements for birth mothers, adoptive parents, and adopted children, reporting greater satisfaction in relationships involving more contact and better support for identity development in adopted children); DH Siegel, *Open adoption: adoptive parents' reactions two decades later*, Soc Work 43 (Jan 2013), https://www.ncbi.nlm.nih.gov/pubmed/23409339 (accessed Aug 18, 2020) (reporting that adoptive parents recognize that openness serves the child's best interests); Deborah H. Siegel, Ph.D., & Susan Livingston Smith, LCSW, *Openness in Adoption: From Secrecy and Stigma to Knowledge and Connections*, Evan B. Donaldson Adoption Inst (2012), https://library.childwelfare.gov/cwig/ws/library/docs/gateway/Blob/81159.pdf?r=1&rpp=10&upp=0&w=+NATIVE%28%27recno%3D81159%27%29&m=1 (accessed Aug 18, 2020) (addressing the trend toward openness in private adoptions in recognition of the negative impacts of secrecy and the benefits to adopted children of ongoing contact, and advocating support for birth and adoptive parents to improve the practice of open adoption). Even accounting for the differences between the private adoption context and a juvenile dependency proceeding, it is not obvious that the best interests of children require termination of the rights of every parent who is deemed unfit to be a minimally adequate custodial resource to their child. *See also* Alexis T. Williams, *Rethinking Social Severance: Post-Termination Contact Between Birth Parents and Children*, 41 Conn L Rev 609 (2008), https://opencommons.uconn.edu/cgi/viewcontent.cgi?article=1012&context=law_review (accessed Aug 18, 2020) (discussing the body of psychological research favoring contact between children and their birth parents in appropriate cases).

  [8] DHS's administrative rules do not constitute evidence of what is in a particular child's best interest.

Because DHS did not carry its burden to demonstrate by clear and convincing evidence that freeing child for adoption was in his best interest, we affirm the juvenile court's judgment denying DHS's petition to terminate mother's parental rights.

Affirmed.