Argued and submitted July 27; jurisdictional judgment reversed and remanded for entry of a judgment establishing dependency jurisdiction based on allegations A and F only, otherwise affirmed October 13, 2021

In the Matter of M. M.,
fka M. M., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. N. M.
and S. A. M.,
*Appellants.*

Linn County Circuit Court
20JU03483; A175291

501 P3d 76

In this juvenile dependency case, mother and father separately appeal from the judgment exercising jurisdiction over their six-month-old infant, M, a child with developmental delays. They argue that the juvenile court erred in denying their joint motion to dismiss the dependency petition for insufficient evidence, and in concluding that the six conditions and circumstances alleged in the dependency petition authorized the court's jurisdiction. *Held*: The evidence was sufficient to permit the juvenile court's assertion of jurisdiction based on allegation A, that "Mother's substance abuse interferes with her ability to safely parent the child," and allegation F, that "Father does not understand the basic needs of his child and lacks the skills necessary to safely parent the child." However, the evidence was insufficient to support jurisdiction based on the remaining allegations B, C, D, and E.

Jurisdictional judgment reversed and remanded for entry of a judgment establishing dependency jurisdiction based on allegations A and F only; otherwise affirmed.

David E. Delsman, Judge.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant T. N. M. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Kenneth A. Kreuscher argued the cause and filed the briefs for appellant S. A. M.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum,

Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Jurisdictional judgment reversed and remanded for entry of a judgment establishing dependency jurisdiction based on allegations A and F only; otherwise affirmed.

**SHORR, J.**

In this juvenile dependency case, mother and father separately appeal from the judgment exercising jurisdiction over their six-month-old infant, M, a child with developmental delays. They argue that the juvenile court erred in denying their joint motion to dismiss the dependency petition for insufficient evidence, and in concluding that the conditions and circumstances alleged in the dependency petition authorized the court's jurisdiction. Because we conclude that only some of the conditions and circumstances alleged in the dependency petition were supported by sufficient evidence, we affirm in part and reverse in part.

"[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We are bound by the juvenile court's express and necessarily implied findings of fact, if supported by any evidence. *Id.* at 639-40.

A juvenile court may assert jurisdiction over a child under ORS 419B.100(1)(c) when it finds that, considering the totality of the circumstances, the child's conditions or circumstances endanger the child's welfare. *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). The Department of Human Services (DHS) must show that the child's conditions or circumstances "present a current threat of serious loss or injury" that is reasonably likely to be realized and not merely speculative. *Id.* at 61-62. When a parent's alleged risk-causing conduct is at issue, DHS has the burden of demonstrating a nexus between the parent's conduct and the threatened harm to the child. *Dept. of Human Services v. L. E. F.*, 307 Or App 254, 258, 476 P3d 119 (2020), *rev den*, 367 Or 559 (2021).

Applying those standards here, the record permits the juvenile court's assertion of jurisdiction based on allegation A, that "Mother's substance abuse interferes with her ability to safely parent the child," and allegation F, that "Father does not understand the basic needs of his child and lacks the skills necessary to safely parent the child."

As to allegation A, the evidence adduced at trial was that mother first began using methamphetamine over 15 years earlier and had gone through inpatient drug treatment for methamphetamine abuse on two previous occasions; that mother tested positive for methamphetamine at a 28-week prenatal health appointment, and that medical professionals advised her at that time of the risks to the fetus that such use posed; that M was born with amphetamine, methamphetamine, and THC in her meconium and amphetamine and methamphetamine in her urine, indicating that mother used methamphetamine both immediately before the birth and also at least once earlier in the pregnancy; that mother made inconsistent statements concerning her drug use but ultimately admitted to use two or three times during her pregnancy including use the day before the birth; that mother declined DHS requests that she provide a voluntary drug screen; and that mother expressed that she would consider attending outpatient drug treatment but did not enroll in treatment. During a meeting with DHS nearly two months after M's birth, mother admitted that she had used methamphetamine three days before the meeting and described her use as "every so often." At trial, mother denied methamphetamine use since M's birth, in conflict with her earlier statements to the DHS caseworker. M was experiencing developmental delays that medical professionals testified would require a heightened level of care, at least for the foreseeable future.

Viewing that evidence in the light most favorable to the state, there was sufficient evidence from which the juvenile court could conclude that mother's methamphetamine use continued to pose a risk of serious loss or injury to M sufficient to support jurisdiction. Mother argues that DHS failed to present evidence that mother was still using methamphetamine at the time of the jurisdictional hearing and, regardless, failed to present a supportable theory as to how any current use presented M with a current threat of serious loss or injury. In our view, the record need not be read so narrowly. First, there was sufficient evidence from which the juvenile court could infer that mother still suffered from a current substance abuse disorder, considering her long history of recurring relapse, lack of interest in

drug treatment, and inconsistent statements regarding her last use of methamphetamine. Second, there were sufficient facts to allow an inference that continued substance abuse would interfere with mother's ability to parent a child who was already high-needs, either by failing to follow through on providing recommended care or simply by being inattentive. Additionally, mother's past use during pregnancy supported an inference that she may continue to place her drug use above her baby's needs.

As to allegation F, that "[f]ather does not understand the basic needs of his child and lacks the skills necessary to safely parent the child," the evidence adduced at trial was that parents missed 16 of their 26 prior supervised visits with M, despite father's belief that they had only missed "three or four"; that parents missed numerous scheduled appointments with DHS; that father slept during many of the supervised visits he did attend; that father struggled at times with preparing formula during those visits; and that, during visitation, mother provided the vast majority of M's care. The DHS assistant who had supervised parents' visits testified that they were not attuned to M's cues and did not engage in "age-appropriate play." Father testified that he had not been aware that mother had been using methamphetamine during the pregnancy until the 28-week prenatal visit, that he believed that mother was clean and ready to parent, and that he did not believe that M was experiencing any development delays or issues absent a feeding issue. DHS contends that the above evidence established that father "lacked insight into M's needs and the parenting skills necessary to address them."

The above evidence sufficiently establishes that father lacked understanding of M's needs and sufficient parenting skills, and that those deficits presented a current threat of serious loss or injury to M. This is especially so considering M's special needs and mother's untreated substance abuse problem. There was sufficient evidence from which the juvenile court could have reasonably inferred that father did not know how to care for an infant without mother's guidance, lacked knowledge of the special care that this particular infant requires, and lacked insight into mother's

drug use such that he would be unable to protect M from that use in the future.

Having concluded that allegations A and F were proved by sufficient evidence, we turn to those allegations that were not. We begin with allegations B and E, which together claim that parents' "residential instability and chaotic lifestyle interfere with [their] ability to safely parent the child." The evidence presented at trial was that, when M was born, parents were living in a recreational vehicle (RV) that was illegally parked and at risk of being towed; that in the time between M's removal and the jurisdictional hearing, parents had upgraded to a trailer that initially had "no hookups" but was later moved to a second location where parents claimed hookups were available; that the trailer was inside a temporary RV park at the Benton County Fairgrounds[1] where parents believed they could stay for two years; that, over a period of months, parents repeatedly denied DHS requests to inspect the inside of the trailer because they claimed it was "not ready"; that, by the time of the jurisdictional hearing, parents testified that the trailer was ready and equipped with electricity, running water, heating, air conditioning, and a refrigerator; and that parents had received an award letter that would allow them to receive a subsidized housing voucher in the near future.

The above evidence, even when viewed in the light most favorable to the juvenile court's disposition, is insufficient to establish that parents were experiencing residential instability that interfered with their ability to safely parent M. Although the evidence supported that parents' living situation was unstable when M was first removed, by the time of the jurisdictional hearing, DHS did not dispute that parents had acquired a relatively stable, albeit temporary, place to live. More importantly, DHS did not meet its burden to show that parents' trailer and residential situation posed a "current threat of serious loss or injury" to M that was reasonably likely to be realized. *C. J. T.*, 258 Or App at 61; *see also Dept. of Human Services v. A. R. S.*, 258 Or App 624, 636, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014) ("[R]esidential instability is not a sufficient basis

---

[1] The DHS caseworker described the RV park as a "COVID relief center."

for jurisdiction without a showing that it creates a risk of harm to the child."). Here, DHS never presented a supportable theory at trial as to how exactly parents' residential situation was likely to harm M. Although DHS appears to place significant weight on parents' refusal to allow DHS to inspect their trailer and the possibility that the trailer could contain unknown risks, that fact merely shows a lack of state evidence regarding the condition of the trailer; it does not provide affirmative evidence that the trailer posed a threat to M. Additionally, DHS's concerns that parents would lose their newfound residential stability were merely speculative. *Dept. of Human Services v. M. Q.*, 253 Or App 776, 786, 292 P3d 616 (2012) ("Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains."). As to the parents' "chaotic lifestyle," DHS points to evidence in the record that parents missed a significant number of supervised visits and other scheduled meetings with DHS. However, that evidence alone is insufficient to prove allegations B and E.

We next consider allegation D, that "Father engages in volatile and erratic behavior that creates a threat of harm to the child." Evidence of father's volatile and erratic behavior adduced at trial is limited to the following: During multiple meetings with DHS, father became "very escalated," displayed "erratic" behavior, was "very upset," was "observed to be pacing around," "raised his voice on multiple occasions," made "semi-threatening statement comments, stating he could find out where [the DHS caseworker] lived," and was able to calm down briefly before becoming "escalated again." One meeting was ended early when father "yell[ed] very loudly, shouting profanities" and the caseworker felt unable to de-escalate the situation. Medical professionals also testified that M was easily overwhelmed and that, as a result, her caregivers needed to refrain from "screaming and yelling" and have "a lot of patience" to prevent that issue from worsening. On appeal, DHS argues that, "[i]f father becomes agitated and almost violent during discussions with DHS about the safety plan, a rational factfinder could conclude that he might lose control when trying to care for a six-month-old baby outside of highly supervised visits." DHS directs us to

*L. E. F.*, a case where we concluded that the evidence was sufficient to support jurisdiction due to the father's "anger control problem." 307 Or App at 260-61.

Even viewing the evidence in the light most favorable to DHS, the record is devoid of any evidence that father exhibited volatile or erratic behavior outside of interactions with DHS regarding custody of his child. As we acknowledged in *L. E. F.*, a parent's anger towards DHS "may simply reflect *** frustration with the process" rather than a safety risk to the child. *Id.* And, unlike in *L. E. F.*, here there are no additional examples of father's volatile or erratic behavior from which a rational factfinder could conclude that father was prone to anger with anyone besides DHS, or that father's anger had impacted or would impact M in any way. *Id.* As such, although we do not doubt that father's behavior was threatening to the DHS caseworker, we cannot conclude that it presented a risk of harm *to M* sufficient to establish jurisdiction.

Lastly, we turn to allegation C, that "Father's substance abuse interferes with his ability to safely parent the child." Father admitted to having "dealt drugs in the past" but claimed that he was "no longer in that world" and denied using methamphetamine or other illegal drugs in the preceding three to four years. Father did, however, admit to legal marijuana use on a regular basis. The DHS caseworker testified that father's behavior was often erratic, that she "struggle[d with] being able to talk to him," that it was "hard to understand him," and that he "slurr[ed] his words"; those behaviors were, based on her "five years of experience with child welfare," "consistent with someone potentially being under the influence" of methamphetamine or THC. Father also appeared to "sleep[] for a good portion" of parents' supervised visits while mother held and cared for M. Father declined DHS's request that he complete a voluntary drug test.

Although this allegation presents a closer case, the evidence presented is ultimately insufficient to establish that father had a substance abuse problem that interfered with his ability to safely parent. Our inquiry is focused on whether father's use of substances placed his child at a risk

of serious loss or injury. Considering that inquiry, we see insufficient evidence on this record that father's substance abuse put M at risk. There is no evidence that father was ever volatile or erratic in M's presence, as explained above. Despite sleeping during visits, the visit notes also detail that father was nevertheless responsive to mother's requests for assistance and appropriate in all his interactions with the child. There was no evidence that father's substance abuse had harmed M in the past, and no theory presented as to how such harm would likely occur in the future. In short, DHS did not meet its burden to establish that father's use of substances would likely harm M, even considering the child's elevated needs. As we have explained before, evidence that a parent uses drugs is insufficient to establish jurisdiction without some theory, supported by the facts, as to how that use poses a risk to the child. *See, e.g.*, *Dept. of Human Services v. A. W.*, 276 Or App 276, 279-80, 367 P3d 556 (2016) (reversing jurisdictional judgment based on the mother's use of methamphetamine and marijuana due to lack of evidence that the mother "used drugs while caring for [the child] or that her drug use had any effect on her parenting"); *Dept. of Human Services v. D. S. F.*, 246 Or App 302, 314, 266 P3d 116 (2011) ("Evidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction over a child.").

In conclusion, the evidence was sufficient to support the juvenile court's jurisdiction over M based on allegations A and F, but insufficient to support jurisdiction based on allegations B, C, D, and E. As a result, we reverse and remand for the court to enter a judgment establishing jurisdiction based on allegations A and F only, and to remove any dispositional orders relating to allegations B, C, D, or E.

Jurisdictional judgment reversed and remanded for entry of a judgment establishing dependency jurisdiction based on allegations A and F only; otherwise affirmed.