No. 64 February 4, 2026 827

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of L. F. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. W. M.,
*Appellant.*

Lane County Circuit Court
21JU00505; A186869

Stephen W. Morgan, Judge.

Submitted September 26, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Emily N. Snook, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Egan, Judge, and Jacquot, Judge.

JACQUOT, J.

Affirmed.

**JACQUOT, J.**

In this juvenile dependency case, father appeals from a judgment establishing a permanent guardianship pursuant to ORS 419B.365 for his 12-year-old son, L.[1] Father raises 10 assignments of error in which he argues that the juvenile court erred in ruling that father was unfit at the time of the guardianship trial. In his eleventh assignment of error, he argues that the juvenile court erred in ruling that it was in L's best interest that father never have physical custody of him, but that father's other parental rights and duties should not be terminated. In his twelfth assignment of error, he argues that the court erred in establishing a permanent guardianship for L. The Oregon Department of Human Services (ODHS) argues that the determinations and disposition by the juvenile court were correct. We conclude that the record was legally sufficient to support the juvenile court's rulings, and we affirm.

## FACTS

L has been living with his permanent guardian, his grandfather, since January 2023.[2] ODHS removed L from father's care in 2021, after an incident in which father beat L's backside and caused bruising to L. There were also red marks and scrapes on his fingers; L reported that he got in trouble and his father hurt his hands. In late 2022, father had made enough progress, including participation in parenting education and mental health treatment, that ODHS approved an in-home plan so long as father had a full-time in-home safety service provider. Based on a psychological evaluation of father in late 2021, a clinical psychologist determined that father had a "strong tendency to externalize blame" and struggled to control his anger. The clinical psychologist opined that "expected" behavior from father would include "react[ing] harshly at times, fail[ing] to perceive his actions as problematic, and reject[ing] concerns about his behavior raised by others including [L]." He was

---

[1] Mother has not been involved in care of L since he was an infant. In 2024, the juvenile court resolved the petition for permanent guardianship regarding mother in her absence. Mother is not a party to this appeal.

[2] The record reflects that grandfather and father have a written agreement regarding visitation between L and father.

diagnosed with "Other Specified Personality Disorder, with paranoid and narcissistic features."

L was again removed from father's care in January 2023 after ODHS learned that the safety service provider had recorded several concerning incidents but had not intervened or reported them to ODHS. Those incidents included father belittling and bullying L. Father also participated in services after L was removed for the second time, though the results of a psychological evaluation completed in late 2023 evidenced that father continued to externalize blame and was extremely defensive, and he still met the criteria for "Other Specified Personality Disorder, with paranoid and narcissistic features." The clinical psychologist opined that father was likely to continue to have "angry outbursts" and that, if he continues to blame others and struggle with managing his own anger, children in his care "would be at escalated risk of harm," including emotional abuse. The clinical psychologist testified that he had "rather significant concerns about [father's] willingness" to engage in any practices that would in any way illustrate that father was attempting to "change his own behavior to reduce problems or address other difficulties."

Father had frequent arguments with his girlfriend, sometimes in the presence of children. A neighbor testified that during one argument, father was "screaming pretty vulgar language" while kicking and banging on a back door to the house trying to get back inside. The neighbor testified that the argument ended after police were called. Father testified that police were never called, and at the time of the hearing, his relationship with his girlfriend was "beautiful, wonderful, safe, [and] healthy."

Although L stated that he wanted to return to father's care, he could express no positives about doing so. L explained to a psychologist that he knows his father can't take care of himself and that L's grandmother has to take care of father. He expressed love for his father and that he wanted to continue having a relationship but could not explain what was good about being with his father.

The juvenile court found that father's testimony was not credible. Although father testified at length about

parenting and coping skills he had developed, he "frequently minimized or omitted significant events" and "attempted to shed a more positive light" on himself and his progression through services. The court found that father made several factual statements which were inaccurate. The juvenile court found that testimony by lay and professional witnesses, including the psychologists and neighbor, was credible. The court found that during the trial reunification period, father's behavior continued to be "volatile[,] * * * targeting [L]," including mocking L when he was upset, not allowing L to talk or express himself, and chasing L through the house when he was trying to get away. The court found that father's pattern of physical aggression and volatility continued after L was removed for a second time, such as his frequent conflicts with his girlfriend over "benign issues." The court found that "father's anger and neglectful conduct towards [L] was triggered by every day, innocuous transgressions by [L] of the type that [father] would reasonably be expected to encounter if [L] was returned to his care." The court also found that father does not recognize his anger or inability to regulate as impacting his ability to provide for L. And, despite the myriad services and supports offered to father to facilitate his ability to safely parent, he has not adequately addressed any of the concerns.

Regarding L's placement, which has been the same since January 2023, the court found that "[L] has demonstrated significant improvements to his development and ability to regulate his own emotions." The court found that L's placement provided him the consistency and predictability that L needs in order to continue growing and improving with his behaviors and managing his diagnoses. The court also found that L and his father have a bond that should be maintained.

## STANDARD OF REVIEW

Turning from the facts to our analysis, we begin by addressing the standard of review applicable in permanent guardianship cases, where ODHS bears the burden to prove its case by clear and convincing evidence. ORS 419B.365(4).

In juvenile dependency cases, we have discretion to "try the cause anew upon the record or make one or more

factual findings anew upon the record," ORS 19.415(3)(b), and we exercise that discretionary *de novo* review "only in exceptional cases." ORAP 5.40(8)(c). Neither party requests *de novo* review, and we decline to conduct it.

Generally, in juvenile dependency cases in which we decline to conduct *de novo* review, we are bound by the juvenile court's express and implied findings of fact if they are supported by any evidence in the record. *Dept. of Human Services v. T. N. M.*, 315 Or App 160, 162, 501 P3d 76 (2021). "[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). Where, as here, ODHS must prove its case by clear and convincing evidence, our task is to "review the sufficiency of the evidence by viewing the evidence in the light most favorable [to the trial court's disposition] to determine whether any rational trier of fact, accepting reasonable inferences and credibility choices, could have" determined that clear and convincing evidence supported the findings and disposition reached by the trial court.[3] *State v. J. D. S.*, 242 Or App 445, 448, 263 P3d 1017 (2011) (so reviewing in the context of civil commitment); *see also Dept. of Human Services v. A. R. E.*, 340 Or App 73, 75-76, 571 P3d 211 (2025) (in the context of a juvenile dependency case governed by Indian Child Welfare Act, explaining that we review "clear and convincing" evidentiary standard matters to determine whether there is "sufficient evidence in the record for a

---

[3] That the grounds for granting a permanent guardianship are the same as the grounds for terminating parental rights, ORS 419B.365(2); *Dept. of Human Services v. M. H.*, 306 Or App 150, 164, 473 P3d 1152 (2020), does not resolve the question of which standard of review we are to apply when a permanent guardianship has been granted. With that in mind, we acknowledge, as we did in *Dept. of Human Services v. N. B.*, 335 Or App 494, 500 n 4, 558 P3d 878 (2024), that

"[t]he parties have not made any arguments as to whether, given the similarities (or differences) between termination of parental rights and placement of children in a permanent guardianship, we should (or should not) grant *de novo* review more readily in appeals involving permanent guardianships. *Cf. Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (considering the differences between durable guardianships, permanent guardianships, and termination in deciding not to grant *de novo* review in a durable-guardianship appeal). *** [W]e do not foreclose consideration of such arguments if raised."

rational factfinder to find that it is highly likely that the fact in question exists"); *State v. S. E. R.*, 297 Or App 121, 122, 441 P3d 254 (2019) (the civil commitment clear and convincing standard is reviewed to determine whether sufficient evidence "permit[s] a rational conclusion that it is highly probable that the person poses a danger to self or others").

## ANALYSIS

A court may grant a petition for permanent guardianship "only if it finds that it is in the best interest of the ward that the parents *never* have physical custody of the ward," *Dept. of Human Services v. T. M. D.*, 365 Or 143, 164, 442 P3d 1100 (2019) (emphasis in original), and if "[t]he grounds cited in the petition are true," ORS 419B.365(4)(a). The "grounds for granting a permanent guardianship are the same as those for termination of parental rights." ORS 419B.365(2).

The proponent of a permanent guardianship must plead and prove that the parent is unfit under any of the grounds set out in the statutory provisions for termination of parental rights, ORS 419B.502 to 419B.508. In this case, ODHS alleged that father was unfit pursuant to ORS 419B.504, which provides, in relevant part:

> "The rights of the parent *** may be terminated *** if the court finds that the parent *** [is] unfit by reason of conduct or condition seriously detrimental to the child *** and integration of the child *** into the home of the parent *** is improbable within a reasonable time due to conduct or conditions not likely to change."

To properly conclude that a parent is unfit under that legal standard, the court must determine, by clear and convincing evidence, that the parent is currently engaged in some conduct or characterized by some condition that is "seriously detrimental" to the child, and if that is so, the court must determine that the child cannot be reintegrated into the parent's home within a reasonable time because the conduct or conditions are unlikely to change. ORS 419B.504; *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). In evaluating whether a child can be reintegrated within a reasonable time, the court must "evaluate

the relative probability that, given particular parental conduct or conditions," the child can be reintegrated into the parental home within "a period of time that is reasonable given [the] child's emotional and developmental needs and ability to form and maintain lasting attachments." *Stillman*, 333 Or at 145-46; *see* ORS 419A.004(26) (providing the statutory definition for "reasonable time").

As we understand it, father primarily argues that, although the court determined his conduct and conditions cause serious detriment to L and are unlikely to change, "father acknowledged that he had harmed [L] through his behavior in the past," but he was not "likely to do so in the future."[4] Father's position is that "through his active participation in batterer's intervention, parenting classes, and individual counseling, father learned a great deal about parenting and about his own issues and vowed that he would never again use corporal punishment or cause [L] physical harm." He argues that ODHS failed to present sufficient evidence that any emotionally abusive or neglectful behavior toward L would persist or that father lacked a stable and safe living situation for L. He argues that even if the court could properly speculate that father might again engage in a fight with a partner in the presence of a child, that there was not enough evidence to support a determination that that possibility would be a serious detriment to L.

In response to father's argument, we focus our analysis on whether there is sufficient evidence to support

---

[4] In his first 10 assignments of error, father argues that the court erred in ruling that, at the time of the guardianship hearing, father was unfit due to his (1) conduct toward L of an abusive, cruel or sexual nature; (2) physical or emotional neglect of L; (3) lack of effort to sufficiently adjust his circumstances, conduct or conditions; (4) failure to effect lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected; (5) mental health condition that rendered him incapable of providing proper care to L for extended periods of time; (6) exposure of L to domestic violence; (7) lack of effort or failure to obtain and maintain a suitable and stable living situation for L; (8) failure to present a viable plan for the return of L to father's care and custody; (9) failure to learn or assume parenting and housekeeping skills sufficient to provide a safe and stable home for L; and (10) mental, emotional or psychological abuse of L.

Father provided a combined argument regarding all of his assignments of error, and ODHS responded with a combined argument. Similarly, we review father's first 10 assignments of error together to determine whether the trial court did or did not err in determining that father was unfit.

the court's determination that seriously detrimental conduct or conditions existed *at the time* of the guardianship hearing and were unlikely to change. Applying our standard of review and considering the evidence in the light most favorable to the trial court's grant of permanent guardianship, we determine that a rational trier of fact could have found that father was, at the time of the guardianship hearing, engaged in conduct or characterized by some condition that is seriously detrimental to L and unlikely to change. As previously mentioned, a disinterested neighbor testified about an incident that occurred in May 2024, several months prior to ODHS petitioning for permanent guardianship and roughly seven months before the court granted the petition. During that incident, father was having an argument with his girlfriend and was "at the back door [of his house] beating on it, screaming, kicking the door ***." Although L was not present at that time, the incident permitted a finding that several months prior to the guardianship hearing, at least some of father's conduct or condition(s) were not managed in the calm manner that father purported to display at all times.

During the hearing, father testified that he is "able to *** breathe through things and *** cope ahead and really just regulate [himself] properly," which is similar to statements made by father at other times during the pendency of this case, such as during psychological evaluations. The mismatch between what father thinks or says about his own behavior and what others observe or experience of his behavior is borne out by both psychological evaluations.[5] The clinical psychologist's determinations are not bare conclusory statements—they are tied to direct observations of

_____

[5] Testimony from father's therapist reflects a similar mismatch. She testified that father told her L was removed initially because of physical discipline by father but that father "has expressed confusion" and didn't understand why L has not been returned. Father did not report any issues he was experiencing with his girlfriend to his therapist, despite the fact that grandmother observed frequent arguments between the two. Father did not talk to his therapist about any struggles he was having regarding emotional regulation. Father mentioned to his therapist that he had participated in psychological evaluations, but never shared any results or diagnoses from those with her and he did not otherwise discuss the possibility of any personality disorder diagnosis. She testified that she was working with father under an "assumption that [he was] bringing in the information that [he felt was] pertinent for them to address."

father. That psychological evaluations of father conducted before and after the second removal of L from father's care were notably similar supports a determination that father was unfit at the time of the hearing, in part, because the psychologist testified that father's ideas and beliefs appear to be "very entrenched, very strong, very stable, [and] very consistent." Father caused harm to L both before the first removal of L and the second removal of L—and after each of those removals, father externalized blame, exhibited an unusual self-perception that the clinical psychologist described as father's belief that he "was particularly able to do things that are really outside the range of reasonable human behavior," and met the criteria for diagnosis of "other specified personality disorder, with paranoid and narcissistic features." The clinical psychologist's testimony that father's detrimental behaviors are likely to persist and that there is a high likelihood that L would experience emotional distress as a result support the court's findings. Testimony by the ODHS caseworker supports the same—she explained that father has participated in a number of courses and programs designed to help him parent and better manage his anger, yet "he still isn't able to demonstrate any of that change."

In sum, the court did not err in concluding that father was unfit at the time of the guardianship hearing, and we turn our analysis to father's eleventh and twelfth assignments of error. In his eleventh assignment of error, father argues that even if we affirm the juvenile court's unfitness determination, we should "reverse on the separate and independent basis that [ODHS] failed to prove that a permanent guardianship with grandfather was in [L]'s best interest."

Pursuant to ORS 419B.365, once a court makes the necessary prerequisite determination under ORS 419B.502 to 419B.508, a permanent guardianship "shall" be granted if "clear and convincing evidence" proves that "[i]t is in the best interest of the ward that the parent never have physical custody of the ward but that other parental rights and duties should not be terminated." In the context of termination of parental rights, the best interests determination

requires a "fact-specific, child-centered inquiry into how termination will likely affect the particular child." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52-53, 515 P3d 927 (2022) (internal citation omitted).

Father argues that "there was also significant evidence of potential concerns with grandfather's care." We are not aware of any opinion in which we have decided whether ORS 419B.365 requires not only determining that the parent should never have physical custody of the child but that other parental rights and duties should not be terminated, but also that the specific proposed permanent guardianship is generally in the best interests of the child. If we follow our practice in contested adoption cases, those determinations must be made via a fact-centered, child-specific inquiry into how the proposed change will likely affect the particular child. In cases where an adoption by a stepparent pursuant to ORS 109.276 involves the termination of parental rights of a nonconsenting parent, the court must first determine whether it is appropriate to terminate parental rights and second must determine whether the specific adoption placement is in the best interests of the child. *J. W. V. v. J. L. W.*, 324 Or App 393, 398-401, 525 P3d 1237 (2023). Similarly, when a court is considering grant of a "durable" guardianship under ORS 419B.366, it must consider whether "[t]he proposed guardian is suitable *** and [whether the g]uardianship is in the ward's best interests."

The parties did not specifically brief this question of whether by incorporating termination "grounds" into ORS 419B.365 the legislature intended to incorporate the more general "best interest" inquiry contained in 419B.500 into the permanent guardianship criteria, and we need not answer it here. From the juvenile court's letter opinion, we understand it to have determined not only that it was in L's best interests for father to never again have physical custody of L but also that remaining in grandfather's care was in L's best interests. To the extent the court was required to make that latter determination, we conclude that it is supported by clear and convincing evidence.

L reported that his grandfather and his grandfather's significant other help him feel "peaceful[,]" and

evidence reflects that L has made progress in managing his own emotional dysregulation and other symptoms while in grandfather's care. A licensed psychologist who evaluated L opined that although making L's custody with grandfather permanent would cause some pain to L due to his fear of abandonment, the stability and clarity provided by permanent placement with grandfather would better serve L in the long run. As noted above, although L expressed a desire to return to his father's care, he could not articulate any positives about doing so. A licensed family therapist testified after having observed a supervised parenting visit between father and L in his grandfather's home. She reported that L had fun playing chess with his father but that he also appeared "hesitant" and like he was trying to figure out what kind of mood his father was in. She testified that L appeared comfortable and displayed appropriate and comfortable interactions with grandfather and grandfather's significant other. She testified that grandfather encouraged L to talk about band and orchestra and L immediately "lit up." She further testified that grandfather's care provided the type of structure, predictability, and consistency that was incredibly important for L given his traumatic background. And evidence in the record supports the juvenile court's finding that grandfather will maintain contact between L and father. In sum, sufficient evidence supported the court's determination that permanent guardianship with grandfather was in L's best interest—to the extent that determination is required, as father argues.

Although father designated the grant of the permanent guardianship as his twelfth assignment of error, he does not raise a separate argument about that assignment of error that has not already been resolved in this opinion. Because the court did not err in making the prerequisite findings or in making the ultimate determination that permanent guardianship with grandfather was in L's best interests, we affirm.

Affirmed.